# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Department of Justice, Antitrust Division<br>600 E Street NW, Suite 9500<br>Washington, DC  20530,<br><br>       Plaintiff,<br><br>       v.<br><br>THE THOMSON CORPORATION<br>Metro Center, 1 Station Place<br>Stamford, CT  06902, and<br><br>REUTERS GROUP PLC<br>The Reuters Building, Canary Wharf<br>London  E14 5EP<br>United Kingdom,<br><br>       Defendants. | CASE NO.: |

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil antitrust action against The Thomson Corporation ("Thomson") and Reuters Group PLC ("Reuters") to obtain equitable relief to prevent Thomson's proposed acquisition of Reuters, and to obtain other relief as appropriate.  The United States alleges as follows:

## I.  NATURE OF THE ACTION

1.      On May 15, 2007, Thomson and Reuters signed an agreement to combine the two companies, with Thomson to control approximately 70% of the combined businesses.  The cash and stock transaction valued Reuters at $17.2 billion.

2.　　　　Thomson and Reuters both create and distribute financial news and data, including fundamentals data, earnings estimates data, and aftermarket research reports. Thomson and Reuters are two of the three largest providers of financial data worldwide to institutions such as investment banks and trading firms. More particularly, Thomson and Reuters are two of the four largest suppliers of fundamentals data to institutions worldwide, two of the three largest suppliers of earnings estimates data to institutions worldwide, and the two largest distributors of aftermarket research reports worldwide.

3.　　　　The United States brings this action to prevent the proposed acquisition of Reuters by Thomson because it would substantially lessen competition in the distribution and sale of fundamentals data, earnings estimates data, and aftermarket research reports in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II. **PARTIES TO THE PROPOSED ACQUISITION**

4.　　　　Thomson is a Canadian corporation with its principal place of business in Stamford, Connecticut. Thomson is comprised of five business divisions: Legal, Financial, Tax & Accounting, Scientific, and Healthcare. Thomson Financial distributes and sells, among other financial products, the relevant products -- fundamentals data, earnings estimates data, and aftermarket research reports.

5.　　　　Thomson is one of the three largest distributors of financial data to institutional users in the world. Thomson is one of the three largest distributors of fundamentals data and is the largest distributor of earnings estimates data and aftermarket research reports. In 2006, Thomson reported company-wide revenues of approximately $6.6 billion, with Thomson Financial accounting for approximately $2 billion.

2

6.      Reuters is a United Kingdom public limited company with its principal place of business in London, England.  Reuters distributes and sells, among other financial products, the relevant products – fundamentals data, earnings estimates data, and aftermarket research reports.

7.      Reuters is also one of the three largest distributors of financial data to institutional users in the world.  Reuters is one of the four largest distributors of fundamentals data in the world, the second largest distributor of earnings estimates data, and the second largest distributor of aftermarket research reports.  In 2006, Reuters reported company-wide revenues of approximately $5 billion.

### III.  JURISDICTION AND VENUE

8.      Plaintiff United States brings this action under Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

9.      Defendants produce, distribute, and sell financial data products and services, including fundamentals data, earnings estimates data, and aftermarket research reports, in the flow of interstate commerce.  Defendants' activities in producing, distributing, and selling these products generate revenues of hundreds of millions of dollars annually and substantially affect interstate commerce.  This court has subject matter jurisdiction over this action pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

10.     Defendants sell a variety of financial data products and services, including fundamentals data, earnings estimates data, and aftermarket research reports, in this judicial district and have consented to venue and personal jurisdiction.

3

# IV. **TRADE AND COMMERCE**

## A. **Financial Data**

11.     Investment managers, investment bankers, traders, corporate managers, and other firms ("institutional financial data users") use financial data to support investment decisions and to  provide advice to their firms or clients.  This data includes relevant news information, pricing information on various types of investment vehicles, and descriptive and predictive data about individual companies, market sectors, or the economy.  Although some financial information, such as delayed stock prices and basic news, is available for no charge on public websites, most institutional financial data users need, and are willing to pay for, higher quality data such as: real-time securities prices; real-time standardized earnings estimates; comprehensive and error-checked fundamentals data; pricing data for fixed-income securities; financial analytic tools; and proprietary news and analysis.

12.     Financial data firms such as Thomson and Reuters typically deliver financial data and other products to their institutional users through a variety of distribution channels.  The so-called "terminals" channel is the largest, wherein financial data providers package or bundle a number of different types of financial data, such as quotes and prices for a variety of financial instruments, fundamentals data, earnings estimates data, macroeconomic data, real-time and aftermarket research, as well as news, charting and other analytic tools.  These types of financial data, analytic tools and news, sold in a variety of packaged configurations with optional content and features, are delivered through customized graphical user interfaces to institutional financial data users' desktop computers.  These products are sold by subscription, generally on a per-user or enterprise basis, with pricing generally based on a single price for the bundled products and

separately priced optional additions.  Thomson and Reuters are two of the three largest providers
of financial data terminals in the United States.

13.     Financial data providers like Thomson and Reuters also deliver financial data
through enterprise-level electronic data feeds that allow an institutional financial data user to
assemble its own packages of financial data, analytic tools, and news; integrate the data with its
own applications; and distribute them within its own organization to users' desktops.  Financial
data providers also sell redistribution rights on a wholesale basis to third parties who distribute
the data to their own terminal or internet-based customers.  Thomson and Reuters have competed
to supply such data to resellers, and third party providers of financial data terminals to
institutional financial data users rely on access to certain types of financial data for which
Thomson and Reuters are the principal suppliers.  Finally, financial data providers also supply
financial data to their customers over the public internet via password-protected websites.

## B.      The Relevant Product Markets

There are three relevant product markets: (1) fundamentals data; (2) earnings estimates
data; and (3) aftermarket research.

### 1.      Fundamentals Data

14.     Fundamentals data concern the financial performance and other attributes of
individual companies, including information from financial statements, calculated financial
ratios, per share data, security and market identifiers, product information, and company profile
data.  Fundamentals data generally pertain to publicly-traded companies and both U.S.-based and
foreign companies.  Providers of fundamentals data such as Thomson and Reuters maintain
fundamentals data for tens of thousands of companies, both active and defunct, over periods of

years or decades.

15.     Providers of fundamentals data extract the data from company financial statements and reports as they are released and update the data on an ongoing basis. Providers add significant value by interpreting and translating footnotes, calculating a variety of ratios, "normalizing" the data into a consistent format, and "standardizing" the data to facilitate comparisons of companies. Such data can be provided to customers in an "as reported" format or in a "standardized" format.

16.     Institutional financial data users utilize fundamentals data in making investment decisions with respect to individual securities, to test investment strategies and models at different points in time, to chart the historical performance of companies, and to back-test quantitative models.

17.     There are no substitutes for fundamentals data. Fundamentals data are a key component needed by institutional financial data users for developing and testing trading strategies and quantitative models as well as making individual investment decisions. Institutional financial data users require timely, reliable, easily accessible, aggregated, accurate, and comprehensive financial data for many thousands of companies.

18.     A small but significant post-acquisition increase in the price of fundamentals data would not cause institutional financial data users to substitute another product or otherwise reduce their use of fundamentals data to a sufficient extent so as to make such a price increase unprofitable.

19.     The distribution and sale of fundamentals data is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

2.      **Earnings Estimates Data**

20.      An earnings estimate is a prediction of a company's earnings, often in terms of quarterly or annual earnings per share.  Thomson and Reuters, and other firms, maintain databases of published earnings estimates going back years or decades.

21.      Providers of earnings estimates data collect and disseminate information from investment bankers and other sources on an ongoing basis.  Collecting estimates data involves obtaining research reports from a wide range of investment bankers and other sources, such as brokerage firms and specialized investment research firms.  Errors in the data are corrected, and as-reported data is normalized to common accounting conventions.  Providers also calculate various consensus estimates across industries or sectors.  These functions add significant value.

22.      Institutional financial data users use earnings estimates when they decide whether to trade or invest in individual securities.  Some institutional financial data users use historical earnings estimates data to evaluate investment strategies.  For example, an analyst with a quantitative model for evaluating stock investments may back-test the proposed model with ten years of earnings history data to determine whether the model would have accurately predicted past price movements.

23.      There are no reasonable substitutes for earnings estimates data.  Earnings estimates data are a key component in the development and testing of quantitative trading models and trading decisions made by many institutional financial data users, who cannot otherwise acquire sufficiently robust, standardized, historic and current earnings estimates data.

24.      A small but significant post-acquisition increase in the price of earnings estimates data would not cause institutional financial data users to substitute other products or otherwise

7

reduce their usage of earnings estimates in sufficient quantities so as to make such a price increase unprofitable.

25.     The distribution and sale of earnings estimates data is a line of commerce and a relevant product market under Section 7 of the Clayton Act.

### 3.     Aftermarket Research Reports

26.     Research reports are detailed research documents prepared by analysts at investment banks, brokerage firms, and other research firms that evaluate the prospects of specific securities.  These reports explain analysts' opinions and include financial projections, such as the company's projected earnings per share of stock at the end of the company's next fiscal quarter.  Research reports are often based on quantitative models of firms' expected performance.

27.     An investment bank or brokerage firm typically provides research reports to its customers immediately on publication.  Such customers may obtain reports through a financial data terminal, via email, or from authorized password-protected websites.  After an embargo period of days or weeks after release to clients has elapsed, investment banks and brokerage firms typically allow their reports to be distributed in an "aftermarket" to other third parties, sometimes for a fee.

28.     Thomson and Reuters aggregate and distribute research reports.  Thomson and Reuters each collect reports from hundreds of investment banks, brokerage firms,  and other research sources and sell copies of such reports once they are no longer embargoed.  To do this, Thomson and Reuters have developed infrastructure including a database of the reports and an electronic distribution system.  Thomson and Reuters also create and maintain indices, tables of

8

contents, and search tools so that third parties can locate and compare the research reports available for purchase without having to contact individual investment banks and brokerage firms. Thomson and Reuters sell aftermarket research reports under various pricing plans, such as per-report, per-page, or so-called "all you can eat" access.

29.    There are no reasonable substitutes for the aftermarket research report distribution services offered by Thomson and Reuters. Aftermarket research reports are a key investment research tool for many institutional financial data users, who cannot acquire the reports' contents by other means. For example, the aggregation, indexing, search, and comparison features provided by distributors of aftermarket research offer functionality not otherwise available. In addition, institutional financial data users cannot, in a practical or efficient manner, contact and arrange access to multiple research reports on an individual basis with possibly hundreds of research providers.

30.    A small but significant post-acquisition increase in the price of aftermarket research report distribution services would not cause institutional financial data users to substitute another product or otherwise reduce their use of such reports in sufficient quantities so as to make such a price increase unprofitable.

31.    The distribution and sale of aftermarket research reports is a line of commerce and a relevant product market under Section 7 of the Clayton Act.

**C.    The Relevant Geographic Market**

32.    Thomson and Reuters sell fundamentals data, earnings estimates data, and aftermarket research reports to institutional financial data users around the world. The world constitutes a relevant geographic market under Section 7 of the Clayton Act for each of these

9

relevant product markets.

**D.    The Proposed Transaction Will Harm Competition in the Relevant Markets**

**1.    Fundamentals Data**

33.    Competition between Thomson and Reuters in the distribution and sale of fundamentals data has benefitted institutional financial data users.

34.    The proposed transaction will significantly increase concentration among suppliers of fundamentals data to institutional financial data users.  In particular, the transaction will eliminate competition between the two major suppliers of fundamentals databases that provide comprehensive global coverage and the historical coverage required for quantitative analysis, as well as competition between two of the three largest suppliers of fundamentals data by datafeed.

35.    The proposed transaction will substantially increase the likelihood that the combined firm unilaterally will increase the price of fundamentals data to a significant number of institutional financial data users.  The combined firm likely would increase price both to institutional financial data users to whom they sell fundamentals data directly, either via data feed or as part of a financial data terminal product sold by Thomson or Reuters, as well as to institutional financial data users to whom Thomson and Reuters sell indirectly, via resellers that offer financial data terminals in competition with Thomson and Reuters. The combined firm would have the incentive and ability to increase the cost of data sold to resellers, or to discontinue such supply of fundamentals data altogether.

36.    The response of other financial data providers will not prevent or undo the competitive harm that will likely result from the proposed merger.  To the extent other providers

10

rely on data acquired from Thomson or Reuters, the combined firm would control the cost and

availability of such data. Responses by firms with independent access to fundamentals data also

would be unlikely to prevent or undo the transaction's competitive harm. A significant number

of institutional financial data users regard the products of Thomson and Reuters as their first and

second choices when purchasing fundamentals data, and consider fundamentals data products

offered by other financial data providers to be distant third choices. An insufficient number of

institutional financial data users would switch to a competing fundamentals data product to

defeat a price increase imposed unilaterally by the merged firm.

37.     Entry into or expansion into fundamentals data is difficult, time consuming, and

costly. New entrants into the fundamentals data market, particularly with respect to international

fundamentals data, must overcome significant barriers to entry. These include the difficulties of

arranging for collection of data on tens of thousands of companies on a global basis, constructing

a reliable historical database, the need to develop local expertise in each country's accounting

norms, and the ability to develop data normalization and standardization processes. Therefore,

entry or expansion by any other firm will not be timely, likely, or sufficient to defeat an

anticompetitive price increase.

38.     Without the constraining effect of competition between Thomson and Reuters, the

combined firm will have a greater ability to exercise market power by raising its prices for

fundamentals data to institutional financial data users without risk of losing significant sales to

competitors.

39.     The transaction will substantially lessen competition in the distribution and sale of

fundamentals data in violation of Section 7 of the Clayton Act. The transaction is likely to lead

11

to higher prices and reduced quality for consumers of such data.

2. **Earnings Estimates Data**

40.     Competition between Thomson and Reuters in the sale of earnings estimates data has benefitted institutional financial data users.

41.     The proposed transaction will significantly increase concentration among suppliers of earnings estimates data, eliminating competition between the world's two largest suppliers of earnings estimates data with broad, global, and historical coverage as well as the two largest suppliers of estimates by datafeed.  Thomson and Reuters have a combined share of over 70% of the worldwide market for earnings estimates data, and each is significantly larger than the third largest supplier.

42.     The proposed transaction will substantially increase the likelihood that Thomson and Reuters will increase the price of earnings estimates data to a significant number of institutional financial data users.  The combined firm likely would increase price both to institutional financial data users to whom they sell estimates data directly, either via data feed or as part of a financial data terminal product sold by Thomson or Reuters, as well as to institutional financial data users to whom Thomson and Reuters sell indirectly, via resellers that offer financial data terminals in competition with Thomson and Reuters.  The combined firm would have the incentive and ability to increase the cost of data sold to resellers, or to discontinue such supply of estimates data altogether.

43.     The response of other financial data providers will not prevent or undo the competitive harm that will likely result from the proposed merger.  To the extent other providers rely on data acquired from Thomson or Reuters, the combined firm would control the cost and

availability of such data.  Responses by firms with independent access to estimates data also would be unlikely to prevent or undo the transaction's competitive harm.  A significant number of institutional financial data users regard the products of Thomson and Reuters as their first and second choices when purchasing earnings estimates data, and consider earnings estimates data offered by other financial data providers to be distant third choices.  An insufficient number of institutional financial data users would switch to a competing earnings estimates data product to defeat an anticompetitive price increase.

44.    Entry into or expansion in the distribution of earnings estimates data is difficult, time consuming, and costly.  Firms entering the market face significant barriers to timely entry, including the difficulty and cost of replicating years or decades of historical data, significant human and intellectual-property resources for standardizing and verifying the data, and the effort and expense to establish the requisite business relationships with hundreds of investment banks and brokerage firms to collect the data.  Therefore, entry or expansion by any other firm will not be timely, likely, or sufficient to defeat an anticompetitive price increase.

45.    Without the effect of competition between Thomson and Reuters, the combined firm will have a greater ability to exercise market power by raising its prices for earnings estimates data to institutional financial data users without risk of losing significant sales to competitors.

46.    The transaction will substantially lessen competition in the distribution and sale of earnings estimates data in violation of Section 7 of the Clayton Act.  This is likely to lead to higher prices and reduced quality for consumers of such data.

### 3.     **Aftermarket Research Reports**

47.     Competition between Thomson and Reuters in the distribution of aftermarket research reports has benefitted institutional financial data users.

48.     The proposed transaction will significantly increase concentration in the distribution of aftermarket research reports.  Thomson and Reuters have a combined market share in excess of 90%, and each is significantly larger than the third largest distributor of aftermarket research reports.

49.     The proposed transaction will substantially increase the likelihood that Thomson and Reuters will increase the price of their aftermarket research to a significant number of institutional financial data users.

50.     The responses of other financial data providers would not prevent or undo the competitive harm that will likely result from the proposed merger.  Other firms lack the requisite relationships with hundreds of investment banks and brokerage firms and a comprehensive collection of research reports, which is both highly valued by institutional financial data users and extremely costly to duplicate.  A significant number of financial data users regard the products distributed by Thomson and Reuters as their first and second choices when purchasing aftermarket research reports, and consider aftermarket research report distribution offered by other financial data providers to be distant third choices.  An insufficient number of institutional financial data users would switch to a competing aftermarket research report distributor to defeat a price increase imposed unilaterally by the merged firm.

51.     Entry into or expansion in the distribution of aftermarket research reports is difficult, time consuming, and costly.  Emerging firms would need to expend significant

resources to attempt to establish the business relationships with hundreds of investment banks and brokerage firms necessary to obtain rights for distribution, collect copies of thousands of existing reports of the contributors, and establish the technological infrastructure for selling aftermarket research reports. Therefore, entry or expansion by any other firm will not be timely, likely, or sufficient to defeat an anticompetitive price increase.

52.     Without competition between Thomson and Reuters, the combined firm will have a greater ability to exercise market power by raising prices to institutional financial data users for whom Thomson and Reuters are the only two sources of aggregated aftermarket research report sale and distribution.

53.     The transaction will substantially lessen competition in the distribution and sale of aftermarket research reports in violation of Section 7 of the Clayton Act. This is likely to lead to higher prices and reduced quality for consumers of such reports.

## IV. VIOLATIONS ALLEGED

54.     The United States incorporates the allegations of paragraphs 1 through 52 above.

55.     The proposed acquisition of Reuters by Thomson would substantially lessen competition in interstate trade and commerce in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

56.     Unless restrained, the transaction will have the following anticompetitive effects, among others:

a.     actual and potential competition between Thomson and Reuters in the distribution and sale of fundamentals data, earnings estimates data, and aftermarket research reports will be eliminated;

15

b.      competition generally in the sale of fundamentals data, earnings estimates data, and aftermarket research reports will be substantially lessened; and

c.      prices for fundamentals data, earnings estimates data, and aftermarket research reports likely will increase.

## V. <u>REQUEST FOR RELIEF</u>

57.     The United States requests that this Court:

a.      adjudge and decree the proposed acquisition to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

b.      enjoin and restrain the Defendants and all persons acting on their behalf from consummating the proposed acquisition or from entering into or carrying out any contract, agreement, plan, or understanding, the effect of which would be to combine Thomson with the operations of Reuters;

c.      award the United States its costs for this action; and

d.      grant the United States such other and further relief as the Court deems just and proper.

16

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:

Thomas O. Barnett
Assistant Attorney General
D.C. Bar #426840

David L. Meyer
Deputy Assistant Attorney General
D.C. Bar #414420

Patricia A. Brink
Deputy Director of Operations

James J. Tierney
Chief, Networks and Technology
Enforcement Section
D.C. Bar #434610

Scott A. Scheele
Assistant Chief, Networks and Technology
Enforcement Section
D.C. Bar #429061

Robert P. Mahnke
N. Scott Sacks (D.C. Bar #913087)
Mary N. Strimel (D.C. Bar #455303)
Aaron Comenetz (D.C. Bar #479572)
Adam T. Severt
Ryan S. Struve (D.C. Bar #495406)
Aaron G. Brodsky
Attorneys
United States Department of Justice
Antitrust Division, Networks and Technology
Enforcement Section
600 E. Street, NW, Suite 9500
Washington, D.C. 20530
(202) 307-6200

Dated: February 19, 2008

17

JS-44
(Rev.1/05 DC)

## CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America | The Thomson Corporation<br>Reuters Group PLC |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____ 88888<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF<br>LAND INVOLVED |
|---|---|
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)<br>Robert P. Mahnke, Esq.<br>United States Department of Justice<br>600 E Street, NW, Suite 9500<br>Washington, DC  20530<br>(202) 307-6200 | ATTORNEYS (IF KNOWN)<br>The Thomson Corporation: Wayne Dale Collins, Esq., Shearman &<br>Sterling LLP, 801 Pennsylvania Ave., NW, Suite 900, Washington, DC<br>20004, (202) 508-8000<br>Reuters Group PLC: Steven A. Newborn, Esq., Weil, Gotshal & Manges<br>LLP, 1300 I St., NW, Washington, DC  20005, (202) 682-7000 |

### II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

(●) 1 U.S. Government
    Plaintiff

(○) 2 U.S. Government
    Defendant

(○) 3 Federal Question
    (U.S. Government Not a Party)

(○) 4 Diversity
    (Indicate Citizenship of
    Parties in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place<br>of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place<br>of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a<br>Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

### IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. Antitrust | ○ B. Personal Injury/<br>Malpractice | ○ C. Administrative Agency<br>Review | ○ D. Temporary Restraining<br>Order/Preliminary<br>Injunction |
|---|---|---|---|
| [X] 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If<br>    Administrative Agency is Involved) | Any nature of suit from any category may<br>be selected for this category of case<br>assignment.<br><br>*(If Antitrust, then A governs)* |

| ○ E. General Civil (Other) | OR | ○ F. Pro Se General Civil |
|---|---|---|

| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or<br>    defendant<br>☐ 871 IRS-Third Party 26<br>    USC  7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure<br>    of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational<br>    Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC<br>    Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced &<br>    Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/<br>    Exchange<br>☐ 875 Customer Challenge 12 USC<br>    3410<br>☐ 900 Appeal of fee determination<br>    under equal access to Justice<br>☐ 950 Constitutionality of State<br>    Statutes<br>☐ 890 Other Statutory Actions (if<br>    not administrative agency<br>    review or Privacy Act |

| O **G. Habeas Corpus/ 2255** | O **H. Employment Discrimination** | O **I. FOIA/PRIVACY ACT** | O **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| O **K. Labor/ERISA (non-employment)** | O **L. Other Civil Rights (non-employment)** | O **M. Contract** | O **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⦿ 1 Original
Proceeding
  O 2 Removed
from State
Court
  O 3 Remanded from
Appellate Court
  O 4 Reinstated
or Reopened
  O 5 Transferred from
another district
(specify)
  O 6 Multi district
Litigation
  O 7 Appeal to
District Judge
from Mag. Judge

---

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

Civil antitrust to enjoin The Thomson Corporation's proposed acquisition of Reuters Group PLC, pursuant to Section 7 of the Clayton Act, 15 U.S.C. s 18.

---

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** ⌐ ¬ | Check YES only if demanded in complaint |
|---|---|---|---|
| | | **JURY DEMAND:** | YES ☐   NO ☒ |

| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | YES ☐   NO ☒ | If yes, please complete related case form. |
|---|---|---|---|

DATE _February 19, 2008_    SIGNATURE OF ATTORNEY OF RECORD   _Ramsey P. M_____

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CASE NO.: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE THOMSON CORPORATION and | ) | |
| REUTERS GROUP PLC, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2008, I caused copies of the

- Complaint;
- [proposed] Final Judgment;
- Competitive Impact Statement;
- Asset Preservation Stipulation and Order;
- Stipulated Motion To Place Schedules 2, 3, And 4 To The Proposed Final Judgment Under Seal;
- [Proposed] Order Placing Schedules 2, 3, And 4 To The Proposed Final Judgment Under Seal;
- Notice Of Filing Under Seal;
- Plaintiff United States' Memorandum Concerning Tunney Act Procedures Required Before Entry Of Final Judgment;
- Civil Cover Sheet; and
- Certificate Of Service

to be served by U.S. mail and electronic mail on the following duly authorized legal representatives of the Defendants in this matter:

**Counsel for Defendant The Thomson Corporation**
Beau W. Buffier, Esq.
Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4843
bbuffier@shearman.com

**Counsel for Defendant Reuters Group PLC**
Lee K. Van Voorhis, Esq.
Weil, Gotshal & Manges LLP
1300 I Street, NW
Washington, D.C. 20005
(202) 682-7272
lee.vanvoorhis@weil.com


Dated: February 19, 2008

FOR PLAINTIFF
UNITED STATES OF AMERICA

Robert P. Mahnke
Networks and Technology Enforcement Section
United States Department of Justice
Antitrust Division
600 E Street, N.W., Suite 9500
Washington, D.C. 20530
(202) 307-6200