# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | CASE NO.: |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE THOMSON CORPORATION and | ) | |
| REUTERS GROUP PLC, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America, pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

## I.    NATURE AND PURPOSE OF THE PROCEEDING

Defendant The Thomson Corporation ("Thomson") and Defendant Reuters Group PLC ("Reuters") entered into a dual-listing agreement, dated May 15, 2007, pursuant to which Thomson will control approximately 70% of the combined businesses.  The United States filed a civil antitrust Complaint on February 19, 2008, seeking to enjoin the proposed acquisition.  The Complaint alleges that the likely effect of this acquisition would be to lessen competition substantially for the distribution and sale of:  (1) fundamentals data; (2) earnings estimates data; and (3) aftermarket research reports in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. This loss of competition likely would result in increased prices for customers.

At the same time the Complaint was filed, the United States also filed an Asset Preservation Stipulation and Order ("Stipulation") and proposed Final Judgment, which are designed to eliminate the anticompetitive effects of the acquisition. Under the proposed Final Judgment, which is explained more fully below, Defendants are required to divest copies of Thomson's fundamentals database, Reuters' earnings estimates database, and Reuters' aftermarket research reports and all associated tangible and intangible assets necessary to operate and distribute the databases in a competitive manner (hereafter the "Divestiture Assets"). Under the terms of the Stipulation, Defendants will take steps to ensure that the Divestiture Assets are preserved, maintained and operated as economically viable and ongoing competitive businesses.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II. DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A. *The Defendants and the Proposed Transaction*

Thomson and Reuters are information services companies with a substantial presence in the distribution and sale of financial data, software, and associated services to financial professionals. Thomson is a Canadian corporation with its principal place of business in Stamford, Connecticut. Of Thomson's 2007 annual revenue of $7.3 billion, $2.2 billion came from the collection and distribution of a wide variety of financial data including securities prices, company profile and financial information (known as "fundamentals"), financial news, earnings estimates, analyst research, and economic data. Thomson's leading brands include Thomson

2

ONE terminals, FirstCall estimates and research, I/B/E/S estimates, and Worldscope

fundamentals. Thomson has operations in all of the world's major markets and has customers

around the globe.

Reuters is a British public limited company with its principal place of business in

London, England. Though Reuters is best known to consumers through its global media brand,

$3.6 billion of the firm's approximately $3.9 billion annual revenue through September 30, 2007,

came from the sale of financial data products, services, and software. Like Thomson, Reuters

collects and aggregates a broad range of financial and economic data, including fundamentals

data, earnings estimates data, and aftermarket research reports. Reuters' major brands include its

3000 Xtra, Trader, and Station terminals; Reuters Market Data System software for

disseminating data feeds throughout enterprises; Reuters Fundamentals (formerly Multex

Fundamentals); and Reuters Estimates (formerly Multex Estimates). Reuters has operations and

significant revenues in all major markets around the world.

The proposed transaction, as initially agreed by Defendants on May 15, 2007, would

lessen competition substantially in the markets for fundamentals data, earnings estimates data,

and aftermarket research reports. This acquisition is the subject of the Complaint and proposed

Final Judgment filed by the United States on February 19, 2008.

B.    *The Competitive Effects of the Transaction on the Relevant Markets for*
      *Fundamentals Data, Earnings Estimates Data, and Aftermarket Research Reports*

1.    *Financial Data*

Investment managers, investment bankers, traders, corporate managers, and others

("institutional financial data users") use financial data to support investment decisions and to

provide advice to their firms or clients. These data include relevant news information, pricing

information on various types of investment vehicles, and descriptive and predictive data about individual companies, market sectors, and the economy. Although some financial information, such as delayed stock prices and basic news, is available for no charge on public websites, most institutional financial data users need, and are willing to pay for, higher quality data such as real-time securities prices, real-time standardized earnings estimates, comprehensive and error-checked fundamentals data, pricing data for fixed-income securities, financial analytic tools, and proprietary news and analysis.

Financial data firms such as Thomson and Reuters deliver financial data and other products to their institutional financial data users through a variety of distribution channels. The largest is the so-called "terminals" channel, whereby financial data providers package a number of different types of financial data, such as quotes and prices for a variety of financial instruments, fundamentals data, earnings estimates data, macroeconomic data, and real-time and aftermarket research reports, as well as news, charting, and other analytic tools. These types of financial data, analytic tools, and news, sold in a variety of packaged configurations with optional content and features, are delivered through customized graphical user interfaces to institutional financial data users' desktop computers. These products are sold by subscription, generally on a per-user or enterprise basis, with pricing generally based on a single price for the bundled products and separately priced optional additions.

Financial data providers like Thomson and Reuters also deliver financial data through electronic data feeds. Some such feeds are sold directly to institutional financial data users, allowing those users to assemble their own package of financial data, analytic tools, and news; integrate the data with its own applications; and distribute the data within its own organization to users' desktops. Feeds are also sold on a wholesale basis to third parties, along with

4

redistribution rights allowing those firms to distribute the data to their own terminal or internet-based customers.  Thomson and Reuters have competed to redistribute such data to third party providers of financial data terminals to institutional financial data users.  These third party providers of financial data terminals rely on access to certain types of financial data, for which Thomson or Reuters are the principal providers.

2.    <em>Relevant Product Markets</em>

The Complaint alleges that the combination of Thomson and Reuters, as initially agreed to by Defendants, would cause competitive harm in the markets for the distribution and sale of fundamentals data, earnings estimates data, and aftermarket research reports.

a.    <em>Fundamentals Data</em>

Fundamentals are data concerning the financial performance and other attributes of companies, including information from financial statements, calculated financial ratios, per share data, product information, and company profile data.  Fundamentals data can pertain to both publicly-traded or privately-held companies and both U.S. and foreign companies.

Financial data providers produce their fundamentals data by harvesting "as reported" information from the financial statements of thousands of companies and inputting the information in a database.  The as-reported financial data then undergo processes of "normalization" into a consistent language and format, and "standardization" to a common accounting convention so that institutional financial data users can compare companies across currencies, geographies, and accounting standards.  Financial data providers add additional value by combining the company data with share data from stock exchanges, calculating a variety of financial ratios, error-checking the data, and maintaining electronic distribution systems to reach subscribers.

5

Institutional financial data users place significant value on fundamentals data that is available for a long time period using a consistent methodology.  Many financial analysts and designers of electronic trading programs (sometimes known as "algorithmic traders") use statistical methods to decide when to buy or sell securities.  Such institutional financial data users rely on the availability of many years of uniformly-calculated, error-checked fundamentals data with which to develop and test their statistical models.

Fundamentals data constitute a relevant antitrust market under Section 7 of the Clayton Act.  A hypothetical monopolist of fundamentals data would be able to impose a small but significant, non-transitory increase in price without losing sufficient sales to make the price increase unprofitable.

b.      *Earnings Estimates Data*

An earnings estimate is a prediction of a company's earnings, often expressed in terms of quarterly or yearly earnings per share.  Financial data providers collect earnings estimates from broker reports on an ongoing basis.  Collecting earnings estimates data involves obtaining the research reports from a wide range of brokerage houses and other financial institutions.  Some firms maintain databases of published earnings estimates going back years or decades.  Errors in the data are corrected, and as-reported data is normalized according to common accounting conventions.  Financial data providers also calculate various consensus estimates across industries or sectors.  These functions add significant value.

Institutional financial data users use earnings estimates data when they decide whether to trade or invest in individual securities.  Some institutional financial data users use historical earnings estimates data to evaluate investment strategies.  For example, an analyst with a quantitative model for evaluating stock investments may back-test the proposed model with ten

6

years of earnings history data to determine whether the model would have accurately predicted

past price movements.

The distribution and sale of earnings estimates data is a relevant antitrust market under

Section 7 of the Clayton Act.  A hypothetical monopolist in the distribution of earnings estimates

data would be able to impose a small but significant, non-transitory increase in price without

losing sufficient sales to make the price increase unprofitable.

c.      *Aftermarket Research Reports*

Research reports are detailed research documents prepared by analysts at investment

banks and brokerage firms which evaluate the prospects of specific securities.  These reports

explain analysts' opinions and include financial projections, such as the company's projected

earnings per share of stock at the end of the company's next fiscal quarter.

A financial institution typically provides research reports to its customers immediately, so

that customers can use the research in trading.  Such customers may obtain reports through a

financial data terminal, by email, or from authorized password-protected websites.  Later, after an

embargo period of days or weeks, banks and brokerages typically allow their reports to be

released, sometimes for a fee, to other third parties.

Financial data providers aggregate and distribute research reports from hundreds of

investment banks and brokerages, distribute them in real-time to entitled customers of the

authoring investment banks and brokerages upon publication, and offer to sell them to other third

parties once they are no longer embargoed (i.e., in the "aftermarket").  As relevant here, in order

to provide their aftermarket research distribution services, financial data providers have

developed infrastructure including a database of the reports and an electronic distribution system.

These firms also create and maintain indices, tables of contents, and search tools so that third

parties interested in purchasing research in the aftermarket can locate and compare the research reports available for purchase without having to contact individual banks and brokerages.

The distribution and sale of aftermarket research reports constitutes a relevant antitrust market under Section 7 of the Clayton Act. A hypothetical monopolist in the distribution and sale of such reports would be able to impose a small but significant, non-transitory increase in price without losing sufficient sales to make the price increase unprofitable.

3.      *Relevant Geographic Market*

Fundamentals data, earnings estimates data, and aftermarket research reports are purchased and sold throughout the world by firms that offer their products on a global basis. The world constitutes a relevant geographic market for the distribution and sale of fundamentals data, earnings estimates data, and aftermarket research reports.

4.      *Anticompetitive Effects*

a.      *Fundamentals Data*

Defendants are two of the world's top four providers of fundamentals data. Their products, Thomson Worldscope and Reuters Fundamentals, are highly regarded and well-accepted among institutional financial data users, including investment bankers, traders, money managers, and corporate managers. For institutional financial data users who require global coverage and significant historical content, Thomson's and Reuters' fundamentals products are each others' closest competitive substitutes. The loss of head-to-head competition between Thomson and Reuters will make it likely that Thomson will unilaterally increase the price of fundamentals data. The combined firm likely would increase price both to institutional financial data users to whom they sell fundamentals data directly, either via data feed or as part of a financial data terminal product sold by Thomson or Reuters, as well as to institutional financial

8

data users to whom Thomson and Reuters sell indirectly, via resellers that offer financial data terminals in competition with Thomson and Reuters.  The combined firm would have the incentive and ability to increase the cost of data sold to resellers, or to discontinue such supply of fundamentals data altogether.

The response of other financial data providers will not prevent or undo the competitive harm that will likely result from the proposed merger.  To the extent other providers rely on fundamentals data acquired from Thomson or Reuters, the combined firm would control the cost and availability of such data.  Responses by firms with independent access to fundamentals data also would be unlikely to prevent or undo the transaction's competitive harm.  A significant number of institutional financial data users regard the products of Thomson and Reuters as their first and second choices when purchasing fundamentals data, and consider fundamentals data products offered by other financial data providers to be distant third choices.  An insufficient number of institutional financial data users would switch to a competing fundamentals data product to defeat a price increase imposed unilaterally by the merged firm.  Nor would entry or expansion by other financial data providers be sufficient to defeat the likely anticompetitive effects of Thomson's proposed acquisition of Reuters because entry into the market for fundamentals data is difficult, time consuming and costly.

Thomson and Reuters currently constrain each others' prices in the market for fundamentals data, and the elimination of competition between them will cause competitive harm in the form of an increased likelihood of higher prices and reduced quality for fundamentals data in violation of Section 7 of the Clayton Act.

        b.     *Earnings Estimates Data*

Defendants are two of the three largest suppliers of earnings estimates data in the world,

with a combined market share in excess of 70%.  Moreover, for institutional financial data users that require earnings estimates data with broad, global, and historical coverage, Defendants' earnings estimates products are each others' closest competitive substitutes.  The loss of head-to-head competition between Thomson and Reuters will make it likely that Thomson will unilaterally increase the price of earnings estimates data.  The combined firm likely would increase the price of earnings estimates data both to institutional financial data users to whom they sell estimates data directly, either via data feed or as part of a financial data terminal product sold by Thomson or Reuters, as well as to institutional financial data users to whom Thomson and Reuters sell indirectly, via resellers that offer financial data terminals in competition with Thomson and Reuters.  The combined firm would have the incentive and ability to increase the cost of data sold to resellers, or to discontinue such supply of earnings estimates data altogether.

The response of other financial data providers will not prevent or undo the competitive harm that will likely result from the proposed merger.  To the extent other financial data providers rely on earnings estimates data acquired from Thomson or Reuters, the combined firm would control the cost and availability of such data.  Responses by firms with independent access to earnings estimates data also would be unlikely to prevent or undo the transaction's competitive harm.  A significant number of institutional financial data users regard the products of Thomson and Reuters as their first and second choices when purchasing earnings estimates data, and consider earnings estimates data offered by other financial data providers to be distant third choices.  An insufficient number of institutional financial data users would switch to a competing earnings estimates data product to defeat an anticompetitive price increase.  Nor would entry or expansion by other financial data providers be sufficient to defeat the likely anticompetitive effects of Thomson's proposed acquisition of Reuters because entry into the market for earnings

estimates data is difficult, time consuming and costly.

Thomson and Reuters currently constrain each others' prices in the market for earnings estimates data, and the elimination of competition between them will cause competitive harm in the form of an increased likelihood of higher prices and reduced quality for earnings estimates data in violation of Section 7 of the Clayton Act.

c.     *Aftermarket Research Reports*

Defendants are the number one and two distributors of aftermarket research reports in the world, with a combined market share in excess of 90%. Both are significantly larger than the third largest distributor of aftermarket research reports. Thomson and Reuters are each others' two closest substitutes in the distribution and sale of aftermarket research reports. The loss of head-to-head competition between Thomson and Reuters will make it likely that Thomson will unilaterally increase the price of aftermarket research reports.

The responses of other financial data providers would not prevent or undo the competitive harm that will likely result from the proposed merger. Other firms lack the requisite relationships with hundreds of investment banks and brokerage firms and a comprehensive collection of research reports, which is both highly valued by institutional financial data users and extremely costly to duplicate. A significant number of financial data users regard the products distributed by Thomson and Reuters as their first and second choices when purchasing aftermarket research reports, and consider aftermarket research report distribution offered by other financial data providers to be distant third choices. An insufficient number of institutional financial data users would switch to a competing aftermarket research report distributor to defeat a price increase imposed unilaterally by the merged firm. Nor would entry or expansion by other financial data providers be sufficient to defeat the likely anticompetitive effects of Thomson's

11

proposed acquisition of Reuters because entry into the market for aftermarket research reports is difficult, time consuming, and costly.

Thomson and Reuters currently constrain each others' prices in the market for aftermarket research reports, and the elimination of competition between them will cause competitive harm in the form of an increased likelihood of higher prices and reduced quality for aftermarket research reports in violation of Section 7 of the Clayton Act.

## III.    EXPLANATION OF THE PROPOSED FINAL JUDGMENT

### A.    The Divestiture Assets

The Divestiture Assets, described in detail in Schedule 1 to the proposed Final Judgment, include all of the assets necessary for an Acquirer(s) that possesses the capability to service institutional financial data users to provide independent and economically viable competition to the merged firm in the markets for distribution and sale of fundamentals data, earnings estimates data, and aftermarket research reports.  The sale of the Divestiture Assets to a qualified Acquirer(s) will thus remedy the anticompetitive effects alleged in the Complaint.

The Divestiture Assets have been carefully tailored to maintain the level of competition that currently exists while avoiding significant and unnecessary disruption for Defendants' customers that purchase bundled terminal services and respecting the intellectual property rights of third parties.   The Divestiture Assets include (1) intellectual property (copies of databases, along with software and technical information), (2) rights to hire necessary personnel, (3) assignment of contributor contracts, (4) assignment of certain customer contracts that will provide the Acquirer(s) access to an on-going revenue stream, and (5) a variety of transitional support services.  Specifically, the Defendants are required to divest copies of the source databases of (i) Thomson's Worldscope fundamentals products, (ii) Reuters' earnings estimates

12

products, and (iii) Reuters' aftermarket research products (which together encompass all of the data and/or research contained in the databases used by Thomson or Reuters to compete in the relevant markets), along with all tangible and intangible assets that an Acquirer(s) would need to operate and maintain the databases and promptly use them to produce competitively viable fundamentals, earnings estimates, and aftermarket research products.  The proposed Final Judgment requires the Defendants to provide the Acquirer(s) rights to intellectual property, such as software or trade secrets, used to produce and maintain fundamentals data, earnings estimates data, or aftermarket research reports, even if Thomson or Reuters also use those assets for products that are not being divested.  With respect to those Divestiture Assets that Defendants make substantial use of for products other than those relating to fundamentals, earnings estimates, and aftermarket research, the Defendants may restrict the use by the Acquirer(s) of such assets to the field of fundamentals, earnings estimates, and aftermarket research, as appropriate.  Finally, the proposed Final Judgment does not require the Defendants to divest certain tangible and intangible assets used in connection with the Defendants' fundamentals, earnings estimates, and aftermarket research products the divestiture of which would not advance the ability of the Acquirer(s) to compete effectively in the pertinent market, given that the Acquirer(s) would have its own access to such assets.  For example, the Defendants need not divest commercially available hardware and software, their trademarks, or land and buildings.

>    B.    *Selected Provisions of the Proposed Final Judgment*

The proposed Final Judgment requires Defendants to take several steps to assist the Acquirer(s) in using the Divestiture Assets in order to enable the Acquirer(s) to provide prompt and effective competition in the relevant markets.  Paragraph IV(C) provides that the Defendants must provide the Acquirer(s) with information about key personnel, identified in Schedule 2 to

the proposed Final Judgment, involved in operating the Divestiture Assets, so that the Acquirer(s) can make offers of employment to such persons.  That Paragraph also prohibits Defendants from interfering with any negotiations by the Acquirer(s) to employ such personnel. Paragraph IV(D) prohibits the Defendants from re-hiring any such persons for a period of 18 months from the date of filing of the Complaint.

Because the Acquirer(s) may need assistance in developing a detailed understanding of the databases and software comprising the Divestiture Assets, and may need time to develop their own capabilities to update the databases on an ongoing basis, Paragraph IV(K) of the proposed Final Judgment gives the Acquirer(s) the option to enter into a transitional support agreement for up to one year for aftermarket research reports and up to 18 months for fundamentals and earnings estimates data.  At the option of the Acquirer(s), such a transitional support agreement may require the combined firm to provide consulting and support services as well as regular updates to the databases comparable to those made by the combined firm to its own comparable databases.

In order to enable the Acquirer(s) to become a viable competitor in the markets for earnings estimates data and aftermarket research, Paragraph IV(G) of the proposed Final Judgment, for a period of two (2) years, prohibits Defendants from entering into any new exclusive agreements with third-party contributors of such data, and limits the terms and conditions under which Defendants may renew existing exclusive agreements with third-party contributors of such data.

Other provisions of the proposed Final Judgment also take into account that the fundamentals, earnings estimates, and aftermarket research databases to be divested contain material contributed by third parties over which those third parties assert continuing intellectual

14

property rights pursuant to contracts with the Defendants.  The proposed Final Judgment gives

the Acquirer(s) access to such third-party contributed data in a manner that respects the third

parties' rights.  Specifically, Paragraph IV(H), regarding earnings estimates data and aftermarket

research reports, requires that the Defendants use their best efforts to assign to the Acquirer(s) all

contracts with third parties for contributed data.  Where the Defendants obtain assignment of the

contribution contracts to the Acquirer(s) (or otherwise obtain the third parties' consent), copies of

the third-party content will pass to the Acquirer(s) as part of the Divestiture Assets.  Where such

assignments or other third-party consent are not obtained on or before the sale of the applicable

Divestiture Assets, Defendants must continue to use their best efforts to obtain assignments of

such contracts until the earlier of:  (1) the date on which the Acquirer(s) of the Reuters earnings

estimates and aftermarket research databases have contribution agreements with eighty percent

(80%) of all third-party contributors and 22 of the 25 most significant contributors (identified in

Schedules 3 and 4 to the proposed Final Judgment) that provided earnings estimates data and/or

aftermarket research reports to Reuters pursuant to contract as of the filing date of the Complaint;

or (2) two years after the date of entry of the Final Judgment.  Paragraph IV(I) contains similar

requirements relating to the assignment of third-party contracts for fundamentals data.  To the

extent necessary third-party consents for fundamentals data, earnings estimates data, or

aftermarket research reports are not obtained before Defendants complete the sale of the

applicable Divestiture Assets, Paragraph IV(J) obligates the Defendants to maintain copies of

third-party content, which will be provided to the Acquirer(s), with all intervening updates, at the

same time as needed consents are obtained.

Paragraph V of the proposed Final Judgment permits the appointment of a Monitoring

Trustee by the United States in its sole discretion and in good faith consultation with the

European Commission, subject to the Court's approval.[1]  If appointed, the Monitoring Trustee

will have the power and authority to monitor Defendants' compliance with the terms of the Final

Judgment and the Stipulation.  The Monitoring Trustee will have access to all personnel, books,

records, and information necessary to monitor such compliance, and will serve at the cost and

expense of Thomson.  The Monitoring Trustee will file monthly reports with the United States

and the Court setting forth Defendants' efforts to comply with their obligations under the

proposed Final Judgment and the Stipulation.

When the United States seeks a divestiture to remedy an antitrust harm in the context of

an acquisition, it requires that the divestiture be completed within the shortest period of time

reasonable under the circumstances.  Paragraph IV(A) of the proposed Final Judgment requires

the Defendants to complete the sale of the Divestiture Assets within 60 calendar days after the

filing of the Complaint, or five calendar days after notice of the entry of this Final Judgment by

the Court, whichever is later.[2]

Sale of the Divestiture Assets may be made to one or more Acquirers, provided that in

---

[1]  The European Commission ("EC") conducted a parallel investigation of the proposed acquisition of Reuters by Thomson.  To remedy competition concerns in Europe, the Defendants have entered into Commitments to the EC to restore competition in certain markets, including those for fundamentals data, earnings estimates data, and aftermarket research reports.  Although the substantive provisions of the proposed Final Judgment and the EC Commitments are much the same, there will be a need for consultations between the Department of Justice and EC regarding certain events such as the selection of the Monitoring Trustee, the Divestiture Trustee, if necessary, and approval of the Acquirer(s).

[2]  The proposed Final Judgment also provides that this 60-day time period may be extended by the United States in its sole discretion for a total period not exceeding 60 calendar days, and that the Court will receive prior notice of any such extension.

16

each instance it is demonstrated to the sole satisfaction of the United States that the assets will remain viable and the divestiture of the assets will remedy the competitive harm alleged in the Complaint.  The assets must be divested in such a way as to satisfy the United States in its sole discretion that the assets can and will be used by the Acquirer(s) as part of a viable, ongoing business that can compete effectively in the relevant markets.  Defendants must take all reasonable steps necessary to accomplish the divestitures quickly and shall cooperate with prospective purchasers.

Paragraph VI of the proposed Final Judgment provides that, in the event the Defendants do not accomplish the divestitures within the periods prescribed in the proposed Final Judgment, the Court will appoint a Divestiture Trustee, selected by the United States in good faith consultation with the European Commission, to effect the divestitures.  If a Divestiture Trustee is appointed, the proposed Final Judgment provides that Defendants will pay all costs and expenses of the Divestiture Trustee.  The Divestiture Trustee's fee arrangement will be structured so as to provide an incentive for the Divestiture Trustee based on the price obtained and the speed with which the divestitures are accomplished.  After his or her appointment becomes effective, the Divestiture Trustee will file monthly reports with the Court and the United States setting forth his or her efforts to accomplish the divestitures.  At the end of six months, if the divestitures have not been accomplished, the Divestiture Trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate, in order to carry out the purpose of the trust, including extending the trust or the term of the Divestiture Trustee's appointment.

Taken together, the assets to be divested and the other obligations imposed by the

17

proposed Final Judgment will enable a qualified Acquirer(s) with a demonstrated ability to distribute financial data to institutional financial data users to provide prompt and effective competition with the combined firm in the markets for fundamentals data, earnings estimates data, and aftermarket research, both by distributing such data directly to institutional financial data customers on a stand-alone basis, and by ensuring that providers of financial data terminal services have access to such data from a source other than the combined firm and are thus able to distribute such data to institutional financial data customers that purchase such data through financial data terminals.

>C.     *Asset Preservation Stipulation and Order*

Defendants have entered into the Stipulation, filed simultaneously with the Court, to ensure that, pending the divestitures, the Divestiture Assets are maintained as ongoing, economically viable, and active business concerns, and Defendants will accomplish the divestitures required by the proposed Final Judgment.  The Stipulation will ensure that the Assets are preserved and maintained in a condition that allows the divestitures to be effective.  It specifically requires that the Defendants not take any steps to disrupt the provision of data to firms that resell such data in competition with them until the Acquirer(s) are able to be a viable alternative source for such data.  It also requires that the parties independently price the stand-alone sale of any relevant product.  Defendants' compliance with these provisions will be monitored by the independent Monitoring Trustee and enforced by the Court.

The Stipulation does not more broadly require the Defendants to operate their own products that include the databases to be divested as separate and independent businesses.  The United States concluded in the unique circumstances of this case that such a requirement was not

18

necessary to ensure effective relief or protect competition pending the completion of the required

divestitures.

## IV.    REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been

injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to

recover three times the damages the person has suffered, as well as costs and reasonable

attorneys' fees.  Entry of the proposed Final Judgment will neither impair nor assist the bringing

of any private antitrust damage action.  Under the provisions of Section 5(a) of the Clayton Act,

15 U.S.C. § 16(a), the proposed Final Judgment will have no prima facie effect in any subsequent

private lawsuit that may be brought against Defendants.

## V.    PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED
##        FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may

be entered by the Court after compliance with the provisions of the APPA, provided that the

United States has not withdrawn its consent.  The APPA conditions entry upon the Court's

determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least 60 days preceding the effective date of the

proposed Final Judgment within which any person may submit to the United States written

comments regarding the proposed Final Judgment.  Any person who wishes to comment should

do so within sixty (60) days of the date of publication of this Competitive Impact Statement in

the Federal Register, or the last date of publication in a newspaper of the summary of this

Competitive Impact Statement, whichever is later.  All comments received during this period will

be considered by the United States Department of Justice, which remains free to withdraw its

consent to the proposed Final Judgment at any time prior to the Court's entry of judgment.  The

comments and the response of the United States will be filed with the Court and published in the

Federal Register.

Written comments should be submitted to:

> James J. Tierney
> Chief, Networks and Technology Enforcement Section
> Antitrust Division
> United States Department of Justice
> 600 E Street, NW, Suite 9500
> Washington, DC  20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the

parties may apply to the Court for any order necessary or appropriate for the modification,

interpretation, or enforcement of the Final Judgment.

## VI.    ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial

on the merits against Defendants.  The United States could have continued the litigation and

sought preliminary and permanent injunctions against Thomson's acquisition of Reuters.  The

United States is satisfied, however, that the divestiture of assets described in the proposed Final

Judgment will preserve competition for the distribution and sale of fundamentals data, earnings

estimates data and aftermarket research reports.  Thus, the proposed Final Judgment would

achieve all or substantially all of the relief the United States would have obtained through

litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the

Complaint.

## VII.    STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a 60-day comment period, after which the court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

> (A)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

> (B)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act).[3]

---

[3] The 2004 amendments substituted "shall" for "may" in directing relevant factors for court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns,* 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

As the United States Court of Appeals for the District of Columbia Circuit has held,

under the APPA a court considers, among other things, the relationship between the remedy

secured and the specific allegations set forth in the government's complaint, whether the decree

is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may

positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62.  With respect to the adequacy

of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what

relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988)

(citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56

F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001).  Courts have

held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust
> consent decree must be left, in the first instance, to the discretion of the Attorney General.
> The court's role in protecting the public interest is one of insuring that the government
> has not breached its duty to the public in consenting to the decree.  The court is required
> to determine not whether a particular decree is the one that will best serve society, but
> whether the settlement is "*within the reaches of the public interest*."  More elaborate
> requirements might undermine the effectiveness of antitrust enforcement by consent
> decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[4]  In determining whether a

proposed settlement is in the public interest, a district court "must accord deference to the

government's predictions about the efficacy of its remedies, and may not require that the

_____

[4] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA]
is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F.
Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the
overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass").
*See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the
decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the
public interest'").

remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter.  "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'"  *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy).  To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459.  Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in

23

the first place," it follows that "the court is only authorized to review the decree itself," and not

to "effectively redraft the complaint" to inquire into other matters that the United States did not

pursue. *Id*. at 1459-60. As this Court recently confirmed in *SBC Communications*, courts

"cannot look beyond the complaint in making the public interest determination unless the

complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489

F. Supp. 2d at 15.

      In its 2004 amendments, Congress made clear its intent to preserve the practical benefits

of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that

"[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing

or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). The language wrote

into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator

Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended

proceedings which might have the effect of vitiating the benefits of prompt and less costly

settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of

Senator Tunney). Rather, the procedure for the public interest determination is left to the

discretion of the court, with the recognition that the court's "scope of review remains sharply

proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F.

Supp. 2d at 11.[5]

---

    [5] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that
the "Tunney Act expressly allows the court to make its public interest determination on the basis
of the competitive impact statement and response to comments alone"); S. Rep. No. 93-298, 93d
Cong., 1st Sess., at 6 (1973)("Where the public interest can be meaningfully evaluated simply on
the basis of briefs and oral arguments, that is the approach that should be utilized."); *United
States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo.
1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in

## VIII.   DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that

were considered by the United States in formulating the proposed Final Judgment.

 Dated: February 19, 2008

Respectfully submitted,

Robert P. Mahnke
N. Scott Sacks
Mary N. Strimel (D.C. Bar #455303)
Aaron Comenetz (D.C. Bar #479572)
Adam T. Severt
Ryan S. Struve (D.C. Bar #495406)
Aaron G. Brodsky
Attorneys
U.S. Department of Justice
Antitrust Division, Networks and
Technology Enforcement Section
600 E Street, NW, Suite 9500
Washington, D.C.  20530
(202) 307-6200

---

making its public interest finding, should . . . carefully consider the explanations of the
government in the competitive impact statement and its responses to comments in order to
determine whether those explanations are reasonable under the circumstances.").