# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | CASE NO.: |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE THOMSON CORPORATION and | ) | |
| REUTERS GROUP PLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## FINAL JUDGMENT

WHEREAS, Plaintiff, United States of America, filed its Complaint on February 19,

2008, and the United States and Defendant The Thomson Corporation ("Thomson") and

Defendant Reuters Group PLC ("Reuters") (collectively "Defendants"), by their respective

attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any

issue of fact or law, and without this Final Judgment constituting any evidence against or

admission by any party regarding any issue of fact or law;

AND WHEREAS, Defendants agree to be bound by the provisions of this Final Judgment

pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain

divestiture of certain rights or assets by the Defendants to assure that competition is not

substantially lessened;

AND WHEREAS, the United States requires Defendants to make certain divestitures for

the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, Defendants have represented to the United States that the divestitures required below can and will be made and that Defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the Defendants, it is ORDERED, ADJUDGED AND DECREED:

## I. Jurisdiction

This Court has jurisdiction over the subject matter of and each of the Defendants to this action.  The Complaint states a claim upon which relief may be granted against Defendants under Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

## II. Definitions

As used in this Final Judgment:

A.     "Acquirer(s)" means the entity or entities to whom Defendants divest the Divestiture Assets.

B.     "Reuters" means defendant Reuters Group PLC, a United Kingdom corporation with its headquarters in London, England, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

C.     "Thomson" means defendant The Thomson Corporation, an Ontario, Canada corporation with its headquarters in Stamford, Connecticut, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors,

-2-

officers, managers, agents, and employees.

D.    "Closing Date" means the date on which the transfer of the Thomson Fundamentals Divestiture Assets, the Reuters Estimates Divestiture Assets, or the Reuters Aftermarket Research Divestiture Assets, as applicable, has been completed as provided in the purchase agreement between the divesting party and the Acquirer(s).

E.    "Divestiture Assets" means the Thomson Fundamentals Divestiture Assets, the Reuters Estimates Divestiture Assets, and the Reuters Aftermarket Research Divestiture Assets, individually or collectively as context may require.

F.    "Estimates" mean predictions by sell-side and independent analysts regarding the future financial performance of a company or security, typically with respect to key earnings metrics such as annual or quarterly earnings per share.

G.    "Aftermarket Research" means reports prepared by sell-side and independent analysts that include an analysis of a security, company, or industry (including company-specific reports and industry-wide reports) and that are no longer restricted ("embargoed") as to recipients by the authoring firm and are generally available for sale to all interested purchasers.

H.    "Fundamentals" means data pertaining to companies and their financial performance, such as reportable financial statement data (e.g., balance sheet, cash flow and income statements), calculated financial ratios (e.g., annual and five-year averages for growth rates, profitability, leverage, asset utilization), textual profile information (e.g., address, identity of officers and directors), and per share data (e.g., earnings per share, book value per share, cash flow per share), that are derived from company filings and financial statements.

I.    "Third-Party Owned Fundamentals" means Fundamentals over which a

contributor maintains an intellectual property right.

J.      "Third-Party Owned Estimates" means Estimates over which a contributor maintains an intellectual property right.

K.      "Third-Party Owned Research" means Aftermarket Research over which a contributor maintains an intellectual property right.

L.      "Thomson Fundamentals Divestiture Assets" means the tangible and intangible assets described in Schedule 1 Paragraphs A, B and G.

M.      "Reuters Estimates Divestiture Assets" means the tangible and intangible assets described in Schedule 1 Paragraphs C, D and G.

N.      "Reuters Aftermarket Research Divestiture Assets" means the tangible and intangible assets described in Schedule 1 Paragraphs E, F and G.

O.      "Direct Content Datafeeds" means datafeeds delivered using FTP (file transfer protocol), CD or DVD media, or other industry standard technology, offering data within a discrete content set (i.e., Thomson Fundamentals or Reuters Estimates), including such data delivered by or through redistributors, where (i) the datafeed can be disaggregated from other product(s) provided by the seller without causing significant disruption to the customer's (or redistributor's) operations; and (ii) the customer's (or redistributor's) contract for the purchase of the datafeed allocates a price for such datafeed.

### III. Applicability

A.      This Final Judgment applies to Thomson and Reuters, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

-4-

B.      If, prior to complying with Section IV and VI of this Final Judgment,

Defendants sell or otherwise dispose of all or substantially all of their assets or of lesser business

units that include the Divestiture Assets, they shall require the purchaser to be bound by the

provisions of this Final Judgment.  Defendants need not obtain such an agreement from the

acquirers of the assets divested pursuant to this Final Judgment.

## IV. <u>Divestitures</u>

A.      Defendants are ordered and directed, within sixty (60) calendar days after the

filing of the Complaint in this matter, or five (5) calendar days after notice of the entry of this

Final Judgment by the Court, whichever is later, to divest the Divestiture Assets in a manner

consistent with this Final Judgment to an Acquirer(s) acceptable to the United States, in its sole

discretion.  The United States, in its sole discretion, may agree to one or more extensions of this

time period not to exceed sixty (60) calendar days in total, and shall notify the Court in such

circumstances.  Defendants shall use their best efforts to divest the Divestiture Assets as

expeditiously as possible.

B.      In accomplishing the divestitures ordered by this Final Judgment, Defendants

promptly shall make known, by usual and customary means, the availability of the Divestiture

Assets.  Defendants shall inform any person making inquiry regarding a possible purchase of the

Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that

person with a copy of this Final Judgment.  Unless the United States otherwise consents in

writing, Defendants shall offer to furnish to all prospective Acquirers, subject to customary

confidentiality assurances, all financial, operational, technical, and other information and

documents relating to the Divestiture Assets customarily provided in a due diligence process

except such information or documents subject to the attorney-client privileges or work-product doctrine. Defendants shall make available such information to the United States and the Monitoring Trustee at the same time that such information is made available to any other person.

      C.     Defendants shall provide the Acquirer(s), the United States, and the Monitoring Trustee information relating to the personnel involved in the development, production, maintenance, and operation of the Divestiture Assets, as described in Schedule 2, to enable the Acquirer(s) to make offers of employment. Defendants shall permit prospective Acquirers of the Divestiture Assets to have reasonable access to personnel described in Schedule 2 and shall not interfere with any negotiations by the Acquirer(s) to employ any such personnel. With respect to any such personnel who receive an offer of employment from the Acquirer(s), Defendants shall (1) not prevent, prohibit or restrict or threaten to prevent, prohibit or restrict such personnel from being employed by the Acquirer(s) nor offer any incentive to decline employment with the Acquirer(s); and (2) cooperate with the Acquirer(s) in effecting the transfer of such personnel and amend or waive any provisions of employment agreements, stock options or other employee benefit arrangements so that such personnel do not suffer adverse consequences as a result of their negotiations with or acceptance of employment by the Acquirer(s).

      D.     For a period of eighteen (18) months from the filing of the Complaint in this matter, Defendants shall not solicit to hire, or hire, any individual described on Schedule 2 hired by the Acquirer(s), unless such individual is terminated or laid off by the Acquirer(s), or the Acquirer(s) agree that Defendants may solicit and employ that individual.

      E.     Defendants shall warrant to the Acquirer(s) that the copies of the Thomson Fundamentals Databases, Reuters Estimates Databases, and Reuters Aftermarket Research

Databases (as defined in Schedule 1) provided as part of the Divestiture Assets are the complete, identical database(s) as maintained by Defendants in the ordinary course of their business, subject to any exclusion for third-party content as permitted by this Final Judgment, and that such copies shall be in an industry-standard format that allows the Acquirer(s) to access and use the data.  Defendants shall also warrant that all other Divestiture Assets, including copies of software, documents, documentation and data, are complete and accurate copies of the materials as maintained by the Defendants in the ordinary course of their business.

F.      Defendants shall not take any action that will impede in any way the operation or divestiture of the Divestiture Assets or the operation of any agreement(s) for transitional support services described in Section IV.K herein.

G.      Unless the United States in its sole discretion provides written consent, the Defendants shall not enter any new exclusive contribution agreements with contributors of Estimates or Aftermarket Research, nor expand the scope or degree of exclusivity of any existing such exclusive contribution agreements, nor renew any such agreement for a term that exceeds one (1) year duration, from the date of filing of this Final Judgment until two (2) years after the date of entry of this Final Judgment.

H.      With respect to each investment bank or other contributor that, as of the date of filing of the Complaint and pursuant to contract, provides (1) Aftermarket Research; (2)  Estimates; or (3) other third-party contributor data used by Reuters to compile, produce, operate, or maintain the Reuters Estimates Databases or the Reuters Aftermarket Research Databases (as defined in Schedule 1), Defendants shall use their best efforts (which obligation shall not require Defendants to overcome commercially unreasonable refusals to consent to

assignment) to procure the assignment of such contract to the Acquirer(s) on or before the

Closing Date.  In the case of any investment bank or other contributor unwilling to consent to

assignment or whose contract cannot otherwise be assigned to an Acquirer on or before the

Closing Date, Defendants shall:

> 1.    assist the Acquirer(s) in reaching contribution agreements directly with
>
> such investment bank or other contributor as promptly as possible, including
>
> waiving any exclusivity provisions with such investment bank or other contributor
>
> as needed; and
>
> 2.    grant the Acquirer(s) redistribution rights to the contributed content to the
>
> maximum extent allowable under the contributor's contract with Reuters,
>
> assisting the Acquirer(s) to put into place any arrangements for the Acquirer's
>
> redistribution of the contributed content, including seeking all needed consents.
>
> Provided, however, that Reuters may terminate such redistribution rights with
>
> respect to a particular third party once the Acquirer concludes any arrangement for
>
> the supply of the contributed content directly from that third party.

The Defendants' obligations pursuant to subparagraphs 1 and 2 above shall cease at the earlier

of: (1) the date on which the Acquirer(s) of the Reuters Estimates Divestiture Assets and the

Reuters Aftermarket Research Divestiture Assets have contribution agreements with eighty

percent (80%) of the firms that provided Aftermarket Research and/or Estimates to Reuters

pursuant to contract as of the filing date of the Complaint, twenty-two (22) of the twenty-five

(25) contributors listed on Schedule 3 (as to the Acquirer of the Reuters Estimates Divestiture

Assets), and twenty-two (22) of the twenty-five (25) contributors listed on Schedule 4 (as to the

Acquirer of the Reuters Aftermarket Research Divestiture Assets); or (2) two (2) years after the date of entry of this Final Judgment.  The Defendants shall not charge the Acquirer(s) for any redistribution rights pursuant to subparagraph 2 above, except that the Acquirer(s) shall pay any fee imposed by the investment bank or other contributor for distribution of such content, and the non-price terms of such redistribution arrangements shall be consistent with the most favorable (to the redistributor) non-price terms of Reuters' agreements with other redistributors of similar content.

      I.      With respect to any contracts for the provision of Fundamentals or other third-party contributor data that Thomson uses in the compilation, production, operation, updating or maintenance of the Thomson Fundamentals Databases as of the date of filing of the Complaint, Defendants shall use their best efforts (which obligation shall not require Defendants to overcome commercially unreasonable refusals to consent to assignment) to procure the assignment of such contracts to the Acquirer on or before the Closing Date.  In the case of any third party unwilling to consent to assignment or whose contract cannot otherwise be assigned to an Acquirer on or before the Closing Date, for a period of two years from the filing date of the Complaint, Defendants shall:

      1.      assist the Acquirer in reaching a supply agreement directly with such third party as promptly as possible, including waiving any exclusivity provisions with such third party as needed; and

      2.      grant the Acquirer redistribution rights to the contributed content to the maximum extent allowable under the contributor's contract with Thomson, assisting the Acquirer(s) to put into place any arrangements for the Acquirer's

redistribution of the contributed content, including seeking all needed consents. Provided, however, that Thomson may terminate such redistribution rights with respect to a particular third party once the Acquirer concludes any arrangement for the supply of the contributed content directly from that third party.

J.     Defendants shall provide for delivery of contracts for the contribution of Aftermarket Research, Estimates, and/or Fundamentals, and for copies of Third-Party Owned Aftermarket Research, Estimates, Fundamentals, or other third-party contributor data as described above to the Acquirer(s) as follows:

1.     to the extent the necessary third party consents are obtained on or before the Closing Date, the contracts and copies of contributed content shall be delivered to the Acquirer(s) as part of the Divestiture Assets;

2.     to the extent the necessary third party consents are not obtained on or before the Closing Date, Defendants shall preserve copies of the contributed content for release to the Acquirer(s) upon receipt of the necessary third party consents.  Defendants' obligation to preserve such copies shall terminate at the earlier of: (i) the date that all preserved copies have been provided to the Acquirer(s); or (ii) Defendants' satisfaction of their obligations pursuant to Section IV.H and IV.I of this Final Judgment; and

3.     for each contributor from whom consent is obtained after the Closing Date but before Defendants satisfy their obligations pursuant to Section IV.H and IV.I of this Final Judgment, Defendants shall deliver to the Acquirer(s), the contributor contract, preserved copies of the content and all intervening updates in machine-

readable form necessary to bring the Acquirer's database current with respect to that contributor.

K.     At the option of the Acquirer(s), the Defendants shall enter into a transitional support services agreement on customary and commercially reasonable terms and conditions to be approved by the United States in its sole discretion, for a period of up to twelve (12) months from the Closing Date (and, in the case of the Thomson Fundamentals Divestiture Assets or the Reuters Estimates Divestiture Assets, at the option of the Acquirer(s), for one additional six (6) month period).  Such agreement(s) shall be designed to enable the Acquirer(s) to compete effectively in the distribution of Fundamentals, Estimates, or Aftermarket Research for financial data users, specifically including institutional users, and shall include, to the extent requested by the Acquirer(s):

1.     consulting and support services sufficient to give that Acquirer a full understanding of the structure and content of all Fundamentals, Estimates, and/or Aftermarket Research data divested to that Acquirer; and

2.     regular updates to the Fundamentals, Estimates, and/or Aftermarket Research data divested to that Acquirer, provided on the same schedule and with the same timeliness, content, and quality as the updates are provided to the Defendants' customers receiving Thomson Fundamentals, Reuters Estimates, or Reuters Aftermarket Research, respectively, subject to any redistribution restrictions on any such updates imposed by any third party content owner.

L.     Unless the United States otherwise consents in writing, the divestiture(s) pursuant to Section IV or Section VI of this Final Judgment shall include the entire Divestiture Assets, and

-11-

shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the

Divestiture Assets can and will be used by the Acquirer(s) as part of a viable, ongoing business

of the distribution of Fundamentals, Estimates, or Aftermarket Research for financial data users,

specifically including institutional users.  Divestiture of the Divestiture Assets may be made to

one or more Acquirers, provided that in each instance it is demonstrated to the sole satisfaction

of the United States that the Divestiture Assets will remain viable and the divestiture of such

assets will remedy the competitive harm alleged in the Complaint.  The divestitures, whether

pursuant to Section IV or Section VI of this Final Judgment,

> (1)  shall be made to an Acquirer(s) that, in the United States's sole judgment, has
>
> the intent and capability (including the necessary managerial, operational, technical and
>
> financial capability) of competing effectively in the business of distribution of
>
> Fundamentals, Estimates, or Aftermarket Research for financial data users, specifically
>
> including institutional users; and
>
> (2)  shall be accomplished so as to satisfy the United States, in its sole discretion,
>
> that none of the terms of any agreement between an Acquirer(s) and Defendants give
>
> Defendants the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's
>
> efficiency, or otherwise to interfere in the ability of the Acquirer to compete effectively.

### V. **Appointment of Monitoring Trustee**

A.       Upon the filing of this Final Judgment, the United States may, in its sole

discretion and in good faith consultation with the European Commission, appoint a Monitoring

Trustee, subject to approval by the Court.

B.      The Monitoring Trustee shall have the power and authority to monitor Defendants' compliance with the terms of this Final Judgment and the Asset Preservation Stipulation and Order entered by this Court and shall have such powers as this Court deems appropriate.  Subject to Section V.D of this Final Judgment, the Monitoring Trustee may hire at the cost and expense of Thomson any consultants, accountants, attorneys, or other persons, who shall be solely accountable to the Monitoring Trustee, reasonably necessary in the Monitoring Trustee's judgment.

C.      Defendants shall not object to actions taken by the Monitoring Trustee in fulfillment of the Monitoring Trustee's responsibilities under any Order of this Court on any ground other than the Monitoring Trustee's malfeasance.  Any such objections by Defendants must be conveyed in writing to the United States and the Monitoring Trustee within ten (10) calendar days after the action taken by the Monitoring Trustee giving rise to the Defendants' objection.

D.      The Monitoring Trustee shall serve at the cost and expense of Thomson, on such terms and conditions as the United States approves.  The compensation of the Monitoring Trustee and any consultants, accountants, attorneys, and other persons retained by the Monitoring Trustee shall be on reasonable and customary terms commensurate with the individuals' experience and responsibilities.

E.      The Monitoring Trustee shall have no responsibility or obligation for the operation of Defendants' businesses.

F.      Defendants shall use their best efforts to assist the Monitoring Trustee in

-13-

monitoring Defendants' compliance with their individual obligations under this Final Judgment

and under the Asset Preservation Stipulation and Order.  The Monitoring Trustee and any

consultants, accountants, attorneys, and other persons retained by the Monitoring Trustee shall

have full and complete access to the personnel, books, records, and facilities relating to the

Divestiture Assets, subject to reasonable protection for trade secret or other confidential research,

development, or commercial information or any applicable privileges.  Defendants shall take no

action to interfere with or to impede the Monitoring Trustee's accomplishment of its

responsibilities.

G.    After its appointment, the Monitoring Trustee shall file monthly reports with the

United States and the Court setting forth the Defendants' efforts to comply with their individual

obligations under this Final Judgment and under the Asset Preservation Stipulation and Order.

To the extent such reports contain information that the trustee deems confidential, such reports

shall not be filed in the public docket of the Court.

H.    The Monitoring Trustee shall serve until the divestiture of all the Divestiture

Assets is finalized pursuant to either Section IV or Section VI of this Final Judgment and any

agreement(s) for transitional support services described in Section IV.K herein have expired.

## VI.  Appointment of Divestiture Trustee

A.    If Defendants have not divested the Divestiture Assets within the time period

specified in Section IV.A, Defendants shall notify the United States of that fact in writing.  Upon

application of the United States, the Court shall appoint a Divestiture Trustee selected by the

United States in good faith consultation with the European Commission and approved by the

Court to effect the divestiture of the Divestiture Assets.

B.    After the appointment of a Divestiture Trustee becomes effective, only the

Divestiture Trustee shall have the right to sell the Divestiture Assets.  The Divestiture Trustee

shall have the power and authority to accomplish the divestiture to an Acquirer(s) acceptable to

the United States at such price and on such terms as are then obtainable upon reasonable effort by

the Divestiture Trustee, subject to the provisions of Sections IV and VI of this Final Judgment,

and shall have such other powers as this Court deems appropriate.  Subject to Section VI.D of

this Final Judgment, the Divestiture Trustee may hire at the cost and expense of Defendants any

investment bankers, attorneys, or other agents, who shall be solely accountable to the Divestiture

Trustee, reasonably necessary in the Divestiture Trustee's judgment to assist in the divestiture.

C.    Defendants shall not object to a sale by the Divestiture Trustee on any ground

other than the Divestiture Trustee's malfeasance.  Any such objections by Defendants must be

conveyed in writing to the United States and the Divestiture Trustee within ten (10) calendar

days after the Divestiture Trustee has provided the notice required under Section VII.

D.    The Divestiture Trustee shall serve at the cost and expense of Defendants, on such

terms and conditions as the United States approves, and shall account for all monies derived from

the sale of the assets sold by the Divestiture Trustee and all costs and expenses so incurred.  After

approval by the Court of the Divestiture Trustee's accounting, including fees for its services and

those of any professionals and agents retained by the Divestiture Trustee, all remaining money

shall be paid to Defendants and the trust shall then be terminated.  The compensation of the

Divestiture Trustee and any professionals and agents retained by the Divestiture Trustee shall be

reasonable in light of the value of the Divestiture Assets and based on a fee arrangement

-15-

providing the Divestiture Trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

E.      Defendants shall use their best efforts to assist the Divestiture Trustee in accomplishing the required divestiture.  The Divestiture Trustee and any consultants, accountants, attorneys, and other persons retained by the Divestiture Trustee shall have full and complete access to the personnel, books, records, and facilities of the business to be divested, and Defendants shall develop financial and other information relevant to such business as the Divestiture Trustee may reasonably request, subject to reasonable protection for trade secret or other confidential research, development, or commercial information.  Defendants shall take no action to interfere with or to impede the Divestiture Trustee's accomplishment of the divestiture.

F.      After its appointment, the Divestiture Trustee shall file monthly reports with the United States and the Court setting forth the Divestiture Trustee's efforts to accomplish the divestiture ordered under this Final Judgment.  To the extent such reports contain information that the Divestiture Trustee deems confidential, such reports shall not be filed in the public docket of the Court.  Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person.  The Divestiture Trustee shall maintain full records of all efforts made to divest the Divestiture Assets.

G.      If the Divestiture Trustee has not accomplished the divestiture ordered under this Final Judgment within six months after its appointment, the Divestiture Trustee shall promptly

-16-

file with the Court a report setting forth (1) the Divestiture Trustee's efforts to accomplish the

required divestiture, (2) the reasons, in the Divestiture Trustee's judgment, why the required

divestiture has not been accomplished, and (3) the Divestiture Trustee's recommendations.  To

the extent such reports contain information that the Divestiture Trustee deems confidential, such

reports shall not be filed in the public docket of the Court.  The Divestiture Trustee shall at the

same time furnish such report to the United States which shall have the right to make additional

recommendations consistent with the purpose of the trust.  The Court thereafter shall enter such

orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if

necessary, include extending the trust and the term of the Divestiture Trustee's appointment by a

period requested by the United States.

## VII. <u>Notice of Proposed Divestiture</u>

A.      Within two (2) business days following execution of a definitive divestiture

agreement, Defendants or the Divestiture Trustee, whichever is then responsible for effecting the

divestiture required herein, shall notify the United States and the Monitoring Trustee of any

proposed divestiture required by Section IV or VI of this Final Judgment.  If the Divestiture

Trustee is responsible, it shall similarly notify Defendants and the Monitoring Trustee.  The

notice shall set forth the details of the proposed divestiture and list the name, address, and

telephone number of each person not previously identified who offered or expressed an interest

in or desire to acquire any ownership interest in the Divestiture Assets, together with full details

of the same.

B.      Within fifteen (15) calendar days of receipt by the United States of such notice,

the United States may request from Defendants, the proposed Acquirer(s), any other third party,

-17-

or the Divestiture Trustee, if applicable, additional information concerning the proposed

divestiture, the proposed Acquirer(s), and any other potential Acquirer.  Defendants and the

Divestiture Trustee shall furnish any additional information requested within fifteen (15)

calendar days of the receipt of the request, unless the Defendants shall otherwise agree.

      C.     Within thirty (30) calendar days after receipt of the notice or within twenty (20)

calendar days after the United States has been provided the additional information requested

from Defendants, the proposed Acquirer(s), any third party, and the Divestiture Trustee,

whichever is later, the United States shall provide written notice to Defendants and the

Divestiture Trustee, if there is one, stating whether or not it objects to the proposed divestiture.

If the United States provides written notice that it does not object, the divestiture may be

consummated, subject only to Defendants' limited right to object to the sale under Section VI.C

of this Final Judgment.  Absent written notice that the United States does not object to the

proposed Acquirer(s) or upon objection by the United States, a divestiture proposed under

Section IV or Section VI shall not be consummated.  Upon objection by Defendants under

Section VI.C, a divestiture proposed under Section VI shall not be consummated unless approved

by the Court.

## VIII.  Financing

Defendants shall not finance all or any part of any purchase made pursuant to Section IV

or VI of this Final Judgment.

## IX.  Preservation of Assets

Until the divestiture required by this Final Judgment has been accomplished, Defendants

shall take all steps necessary to comply with the Asset Preservation Stipulation and Order entered

by this Court.  Defendants shall take no action that would jeopardize the divestiture ordered by this Court.

## X.  Affidavits

A.     Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestiture has been completed under Section IV or VI, Defendants shall deliver to the United States and the Monitoring Trustee an affidavit as to the fact and manner of its compliance with Section IV or VI of this Final Judgment.  Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period.  Each such affidavit shall also include a description of the efforts Defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to prospective Acquirers, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by Defendants, including limitation on information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B.     Within twenty (20) calendar days of the filing of the Complaint in this matter, Defendants shall deliver to the United States and the Monitoring Trustee an affidavit that describes in reasonable detail all actions Defendants have taken and all steps Defendants have implemented on an ongoing basis to comply with Section IX of this Final Judgment.  Defendants shall deliver to the United States and the Monitoring Trustee an affidavit describing any changes

to the efforts and actions outlined in Defendants' earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C.      Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one year after such divestiture has been completed.

## XI.  Compliance Inspection

A.      For the purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to Defendants, be permitted:

(1)      access during Defendants' office hours to inspect and copy, or at the option of the United States, to require Defendants to provide hard copy or electronic copies of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Defendants, relating to any matters contained in this Final Judgment; and

(2)      to interview, either informally or on the record, Defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters.  The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendants.

B.      Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, Defendants shall submit written reports or response to written interrogatories, under oath if requested, relating to any of the matters contained in this

-20-

Final Judgment as may be requested.

C.    No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.    If at the time information or documents are furnished by Defendants to the United States, Defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and Defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United States shall give Defendants ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XII.  **No Reacquisition**

Defendants may not reacquire any part of the Divestiture Assets during the term of this Final Judgment.

## XIII.  **Retention of Jurisdiction**

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIV.  Expiration of Final Judgment

Unless this Court grants an extension, this Final Judgment shall expire ten (10) years from the date of its entry.

## XV.  Public Interest Determination

Entry of this Final Judgment is in the public interest.  The Defendants have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States' responses to comments.  Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

Court approval subject to procedures
of Antitrust Procedures and Penalties
Act, 15 U.S.C. § 16

Dated:

_____
United States District Judge

-22-

## SCHEDULE 1 - DESCRIPTION OF DIVESTITURE ASSETS

A.      The Thomson Fundamentals Divestiture Assets means copies of all master source Fundamentals databases used in, or in the production of Thomson's Fundamentals products, comprising the complete electronic collection of "as reported" Fundamentals that Thomson uses for the "Enterprise FX" product and the complete electronic collection of "standardized" Fundamentals that Thomson uses for the "Worldscope File2" product (individually and collectively, the "Fundamentals Databases"), and all tangible and intangible assets (or separable portions thereof) that Thomson uses in the compilation, production, operation, updating, or maintenance of the Fundamentals Databases, subject to the exclusions in Paragraphs B and G below, including:

1.      a copy of the Fundamentals Databases, including any Third-Party Owned Fundamentals for which any requisite consents are obtained;

2.      a copy (including any third-party owned data or materials for which any requisite consents are obtained) of all data, source documents, and other documentary materials used, and all database annotations made, by Thomson in the collection, aggregation, normalization, standardization, updating, indexing, or tagging of the Fundamentals Databases, current as of the Closing Date;

3.      a perpetual, worldwide, assignable, sublicensable, transferable, royalty-free, non-exclusive license to market, distribute, and prepare derivative works of the Fundamentals Databases, data and documentary materials described in sub-paragraphs A.1 and A.2 above (and to manufacture, reproduce, and have reproduced such derivative works), subject to the third-party consents described therein, without further compensation to

-23-

Thomson and without any restriction other than those permitted in Paragraph B.5 below;

4.      a perpetual, worldwide, assignable, sublicensable, transferable, royalty free, non-exclusive license of all intellectual property rights, formulations, specifications, trade secrets, know-how, and technical information embodied in the Fundamentals Databases or used in their compilation, production, operation, updating, or maintenance, subject to the third-party consents described above;

5.      copies of and a perpetual, worldwide, assignable, non-licensable, transferable, royalty-free, non-exclusive license to use and to prepare derivative works of (and to manufacture, reproduce, or have reproduced such derivative works) all training and other manuals, workflow documents, business processes, data definitions, and instructions used by Thomson in connection with the above-described databases, including all business logic used to map between "as reported" and "standardized" data, including a guide to standardized data definitions;

6.      at the option of the Acquirer, copies of and a perpetual, worldwide, assignable, non-licensable, transferable, royalty-free, non-exclusive license to use and to prepare derivative works of (and to manufacture, reproduce, or have reproduced such derivative works) the following software (including source code and all documentation relating thereto):

i.      all software used to compile, produce, operate, update, or maintain the Fundamentals Databases, including without limitation (a) software for collection, aggregation, normalization, standardization, updating, indexing, or tagging of Fundamentals, and (b) software providing "click-through" functionality to access

-24-

the source documents underlying the Thomson Fundamentals Databases; and

ii.    any improvements, research or developments regarding the software described in Paragraph 6(i) above in existence at any time between January 1, 2007 and the Closing Date;

7.    to the extent assignable, all Thomson customer contracts or assignable portions thereof for Direct Content Datafeed delivery of Fundamentals, including any contracts for delivery to clients by or through redistributors; and

8.    to the extent assignable as set forth in Section IV.I of the Final Judgment, all contracts for the supply to Thomson of Fundamentals or other third-party contributor data (including industry standard symbology such as CUSIP, SEDOL, classification codes such as ICB sector codes, price and corporate action data, ADR information and currency exchange rates) that Thomson uses in the compilation, production, operation, updating, or maintenance of the Fundamentals Databases.

B.    Exclusions:  The Thomson Fundamentals Divestiture Assets do not include:

1.    any commercially-available hardware or software (including any superseded hardware or software for which more recent compatible versions are available), except to the extent of custom software modifications made by or for Thomson;

2.    any Thomson trademarks, service marks or brands or any licenses thereto (including without limitation any rights to use the names "Thomson" or "Worldscope," alone or in connection with any of the Thomson Fundamentals Divestiture Assets);

3.    any proprietary identification systems of Thomson that are used to produce non-Worldscope offerings and that are not necessary to the compilation, production,

operation, updating, or maintenance of the Fundamentals Databases;

4.     any customer contracts other than those assigned pursuant to Paragraph A.7 above, any

customer lists, or any customer account information except as needed to effectuate the

assignment of contracts described in Paragraph A.7 above; and

5.     where Thomson uses any formulation, specification, trade secret, software program,

patent, or source data (other than the contents of the Fundamentals Databases) described

above substantially in the production or distribution of offering(s) other than Worldscope

or Enterprise FX, Defendants may limit the Acquirer's transferable license to use of such

intellectual property solely in activities relating to the field of Fundamentals data.

C.     The Reuters Estimates Divestiture Assets means copies of all master source Estimates

databases used in, or in the production of Reuters Estimates offerings, comprising the complete

collection of "detailed" and "consensus" Estimates as included in the Reuters Knowledge Direct

- Estimates product (individually and collectively, the "Estimates Databases"), and all tangible

and intangible assets (or separable portions thereof) that Reuters uses in the compilation,

production, operation, updating, or maintenance of the Estimates Databases, subject to the

exclusions in Paragraphs D and G below, including:

1.     a copy of the Estimates Databases, including any Third-Party Owned Estimates for which

any requisite consents are obtained;

2.     a copy (including any third-party owned data or material for which any requisite consents

are obtained) of all data, notes and other documentary material and source documents (as

such source documents are used and maintained in the ordinary course of business in

connection with the Estimates Databases) used, and all database annotations made, by

Reuters in the aggregation, verification, annotation, standardization, updating, indexing or tagging of Estimates, current as of the Closing Date, such as data relating to inclusions/exclusions of Estimates from consensus values, accounting treatments of particular earnings or charges, and collection practices, current as of the Closing Date;

3.      a perpetual, worldwide, assignable, sublicensable, transferable, royalty-free, non-exclusive license to market, distribute, and prepare derivative works of the Estimates Databases, data and documentation described in Paragraphs C.1 and C.2 (and to manufacture, reproduce, and have reproduced such derivative works), subject to the third-party consents described therein, without further compensation to Reuters and without any restriction other than those permitted in Paragraph D.6 below;

4.      a perpetual, worldwide, assignable, sublicensable, transferable, royalty free, non-exclusive license of all intellectual property rights, formulations, specifications, trade secrets, know-how, and technical information embodied in the Estimates Databases or used in their compilation, production, operation, updating, or maintenance, subject to the third-party consents described above;

5.      copies of and a perpetual, worldwide, assignable, non-licensable, transferable, royalty-free, non-exclusive license to use and to prepare derivative works of (and to manufacture, reproduce, or have reproduced such derivative works) all training and other manuals, workflow documents, business processes, data definitions, and instructions used by Reuters in connection with the Estimates Databases, including all information and processes used to calculate consensus estimates;

6.      at the option of the Acquirer, copies of and a perpetual, worldwide, assignable, non-

-27-

licensable, transferable, royalty-free, non-exclusive license to use and to prepare

derivative works of (and to manufacture, reproduce, or have reproduced such derivative

works) the following software (including source code and all documentation relating

thereto):

    i.     all software used to compile, produce, operate, update, or maintain the Estimates

          Databases, including without limitation, software for collection, aggregation,

          verification, annotation, standardization, updating, indexing or tagging of

          Estimates (including the software components used to implement contributor

          permissioning of detailed estimates); and

    ii.    any improvements, research or developments regarding the software described in

          Paragraph 5(i) above in existence at any time between January 1, 2007 and the

          Closing Date;

7.    to the extent assignable, all Reuters customer contracts or assignable portions thereof for

    Direct Content Datafeed delivery of Estimates, including any contracts for delivery to

    clients by or through redistributors; and

8.    to the extent assignable as set forth in Section IV.H of the Final Judgment, all contracts

    for the supply of Estimates or other third-party contributor data (including corporate

    actions and currency exchange rates) used by Reuters in the compilation, production,

    operation, updating, or maintenance of the Estimates Databases.

D.    Exclusions:  The Reuters Estimates Divestiture Assets do not include:

1.    any commercially-available hardware or software (including any superseded hardware or

    software for which more recent compatible versions are available), except to the extent of

custom software modifications made by or for Reuters;

2.    any Reuters trademarks, service marks or brands or any licenses thereto (including without limitation any rights to use the names "Reuters" or "Multex," alone or in connection with any of the Reuters Estimates Divestiture Assets);

3.    any Reuters Instrument Codes or license(s) to use or distribute such codes, or any other proprietary identification systems of Reuters that are used to produce Reuters offerings other than Reuters Knowledge Direct - Estimates and that are not necessary to the compilation, production, operation, updating, or maintenance of the Estimates Databases;

4.    any customer contracts, except those assigned pursuant to Paragraph C.7 above;

5.    customer lists or customer account information, except as needed to effectuate the assignment of contracts described in Paragraph C.7 above;

6.    where Reuters uses any formulation, specification, trade secret, software program, patent, or source data (other than the contents of the Estimates Databases) described above substantially in the production or distribution of offering(s) other than the Estimates Databases, Defendants may limit the Acquirer's transferable license to use of such intellectual property solely in activities relating to the field of Estimates data.

E.    The Reuters Aftermarket Research Divestiture Assets means copies of all master source databases containing Aftermarket Research used in, or in the production of Reuters Aftermarket Research offerings, comprising the complete collection of Aftermarket Research as included in the Reuters Knowledge product, but excluding any research reports in such databases which Reuters is not licensed to sell as Aftermarket Research (individually and collectively, the "Aftermarket Research Databases"), and all tangible and intangible assets (or separable portions

thereof) that Reuters uses in the compilation, production, operation, updating, or maintenance of the Aftermarket Research Databases, subject to the exclusions in Paragraphs F and G below, including:

1.      a copy of the Aftermarket Research Databases, including any Third-Party Owned Aftermarket Research for which any requisite consents are obtained, and including any Aftermarket Research described in Schedule 5 for which the Acquirer agrees to the most favorable (to the redistributor) terms, including royalty rate, then provided by the owner of such Aftermarket Research to any other redistributor as of the Closing Date;

2.      a copy (including any third-party owned data or material for which any requisite consents are obtained) of all data and other documentary material used, and all database annotations made, by Reuters in the collection, aggregation, normalization, standardization, updating, indexing or tagging of Aftermarket Research, including all data (subject to any requisite third-party consents) used to implement "embargo" periods, to block certain classes of users from accessing certain subsets of Aftermarket Research, or for purchase tracking, reporting and billing;

3.      a perpetual, worldwide, assignable, sublicensable, transferable, royalty-free, non-exclusive license to market, distribute, and prepare derivative works of the Aftermarket Research Databases, data and documentation described in Paragraphs E.1 and E.2 (and to manufacture, reproduce, and have reproduced such derivative works), subject to the third-party consents described therein and any agreement(s) described in Paragraph E.1 above, without further compensation to Reuters and without any restriction other than as agreed to in Paragraph E.1 above or permitted in Paragraph F.5 below;

-30-

4.    a perpetual, worldwide, assignable, sublicensable, transferable, royalty free, non-exclusive license of all intellectual property rights, formulations, specifications, trade secrets, know-how, and technical information embodied in the Aftermarket Research Databases or used in their compilation, production, operation, updating, or maintenance, subject to the third-party consents described above;

5.    copies of and a perpetual, worldwide, assignable, non-licensable, transferable, royalty-free, non-exclusive license to use and to prepare derivative works of (and to manufacture, reproduce, or have reproduced such derivative works) all training and other manuals, workflow documents, business processes, data definitions, and instructions used by Reuters in connection with the Aftermarket Research Databases; and

6.    at the option of the Acquirer, copies of and a perpetual, worldwide, assignable, non-licensable, transferable, royalty-free, non-exclusive license to use and to prepare derivative works of (and to manufacture, reproduce, or have reproduced such derivative works) the following software (including source code and all documentation relating thereto):

    i.    all software used to compile, produce, operate, update, or maintain the Aftermarket Research Databases, including without limitation software for collection, aggregation, normalization, standardization, updating, indexing, or tagging of Aftermarket Research (including any software component used to implement "embargo" periods, to block certain classes of users from accessing certain subsets of Aftermarket Research, or for purchase tracking, reporting and billing), and

ii.    any improvements, research or developments regarding the software described in

subparagraph 6(i) above in existence at any time between January 1, 2007 and the

Closing Date;

7.    to the extent assignable as set forth in Section IV.H of the Final Judgment, all contracts

for the supply of Aftermarket Research used by Reuters in the compilation, production,

operation, updating, or maintenance of the Aftermarket Research databases; and

8.    a license to redistribute updates, additions, or future versions of any Aftermarket

Research described in Schedule 5, on the most favorable (to the redistributor) terms,

including royalty rate, then provided by the owner of such Aftermarket Research to any

other redistributor as of the Closing Date.

F.    <u>Exclusions:</u>  The Reuters Aftermarket Research Divestiture Assets do not include:

1.    any commercially-available hardware or software (including any superseded hardware or

software for which more recent compatible versions are available), except to the extent of

custom software modifications made by or for Reuters;

2.    any Reuters trademarks, service marks or brands or any licenses thereto (including

without limitation any rights to use the names "Reuters" or "Multex," alone or in

connection with any of the Reuters Aftermarket Research Divestiture Assets);

3.    any Reuters Instrument Codes or license(s) to use or distribute such codes or any other

proprietary identification systems of Reuters that are used to produce Reuters offerings

other than Aftermarket Research and that are not necessary to the compilation,

production, operation, updating, or maintenance of the Aftermarket Research Databases;

4.    customer contracts, customer lists, or customer account information other than (i)

-32-

information about contributors' embargo periods and billing arrangements as described in Paragraph E.2 above or (ii) information needed to effectuate the assignment of contracts in E.7 above; and

5. where Reuters uses any formulation, specification, trade secret, software program, patent, or source data (other than the contents of the Aftermarket Research Database) described above substantially in the production or distribution of offering(s) other than Aftermarket Research, Defendants may limit the Acquirer's transferable license to use of such intellectual property solely in activities relating to the field of Aftermarket Research.

G. <u>General Exclusions:</u> The Divestiture Assets do not include:

1. land and buildings;

2. goodwill;

3. advertising materials;

4. backup or archival copies of software, data or documents to the extent they duplicate the materials being delivered to the relevant Acquirer(s) pursuant to Paragraphs A, C or E;

5. personnel other than such employees described in Schedule 2; and

6. any obligation to support or maintain any software or other intellectual property transferred to the Acquirer except as set forth herein or in any agreement for transitional services described in Section IV of the Final Judgment or in the Asset Preservation Stipulation and Order entered by this Court.

H. For the avoidance of doubt, the parties shall not be required to divest any desktop product, including RMDS, ThomsonOne, Thomson Datastream, Reuters Knowledge desktop interface, or Reuters 3000Xtra, except any component thereof to the limited extent, if any, that

such component is included in the definition of Divestiture Assets, in which case such

component(s) shall be subject to Paragraphs B.5, D.6, and F.5, as applicable.

## *SCHEDULE 2*

### *KEY PERSONNEL*

1. **FUNDAMENTALS**                          [*REDACTED*]

| Role | Description of Role | Location (Number) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

## 2. RESEARCH AND ESTIMATES                [*REDACTED*]

| Role | Description of Role | Location (Number) |
|------|---------------------|-------------------|
|      |                     |                   |
|      |                     |                   |
|      |                     |                   |
|      |                     |                   |
|      |                     |                   |

# ADDITIONAL PERSONNEL

## 1. FUNDAMENTALS                    [*REDACTED*]

|  | Bangalore | Manila | Cardiff | Other | Total |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| Total |  |  |  |  |  |

## 2. ESTIMATES                    [*REDACTED*]

| Role | Description of Role | Location (Number) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

-37-

## *SCHEDULE 3*

1

2

3

4

5

6

7

8

9

10

11

12

13                               **[*REDACTED*]**

14

15

16

17

18

19

20

21

22

23

24

25

## *SCHEDULE 4*

1

2

3

4

5

6

7

8

9

10

11

12

13                              **[*REDACTED*]**

14

15

16

17

18

19

20

21

22

23

24

25

## *SCHEDULE 5*

Lipper Fact Sheets
Lipper Mutual Fund Research
Lipper Hedge Fund Research
Reuters Company Research
Reuters Investment Profiles
StockVal Research Reports*


\* Discontinued in 2005

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE THOMSON CORPORATION and | ) | |
| REUTERS GROUP PLC, | ) | |
| | ) | |
| Defendants. | ) | |

**ASSET PRESERVATION STIPULATION AND ORDER**

It is hereby stipulated and agreed by and between the undersigned parties, subject to approval and entry by the Court, that:

**I. Definitions**

As used in this Stipulation and Order:

A.     The terms "Acquirer(s)," "Aftermarket Research," "Direct Content Datafeeds," "Divestiture Assets," "Estimates," "Fundamentals," "Reuters," and "Thomson" have the same meaning as defined in the proposed Final Judgment in this action filed herewith.

**II. Objectives**

The proposed Final Judgment is meant to ensure Defendants' prompt divestitures of the Divestiture Assets for the purpose of preserving viable competition in the business of distribution of Fundamentals, Estimates, or Aftermarket Research information for institutional use to remedy

the anticompetitive effects that the United States alleges would otherwise result from the

Defendants' merger.  This Stipulation will ensure that until the divestitures required by the

proposed Final Judgment have been accomplished, Thomson and Reuters, with respect to their

Fundamentals, Estimates, and Aftermarket Research businesses, will continue to be operated as

economically viable and ongoing competitive businesses and that the Divestiture Assets will be

preserved and maintained.

### III.  Jurisdiction and Venue

The Court has jurisdiction over the subject matter of this action, and Defendants waive all

objections to the Court's exercise of personal jurisdiction over Defendants in this action and to

the propriety of venue in the United States District Court for the District of Columbia.

### IV.  Compliance with and Entry of the Proposed Final Judgment

A.      The parties stipulate that the proposed Final Judgment may be filed with the Court,

and that, upon the motion of any party or upon the Court's own motion, it may be entered at any

time after compliance with the requirements of the Antitrust Procedures and Penalties Act (15

U.S.C. § 16), without further notice to any party or other proceedings, provided that the United

States has not withdrawn its consent, which it may do at any time before the entry of the

proposed Final Judgment by serving notice thereof on Defendants and by filing that notice with

the Court.

B.      Defendants shall abide by and comply with the provisions of the proposed Final

Judgment pending its entry by the Court, or until expiration of time for all appeals of any Court

ruling declining entry of the proposed Final Judgment, and shall, from the date of the signing of

this Stipulation by the parties, comply with all the terms and provisions of the proposed Final

Judgment as though the same were in full force and effect as an order of the Court.

      C.      Defendants shall not consummate the transaction sought to be enjoined by the Complaint herein before the Court has signed this Stipulation.

      D.      This Stipulation shall apply with equal force and effect to any amended proposed Final Judgment agreed upon in writing by the parties and submitted to the Court.

      E.      In the event: (1) the United States has withdrawn its consent, as provided in Section IV(A) above, or (2) the proposed Final Judgment is not entered pursuant to this Stipulation, the time has expired for all appeals of any Court ruling declining entry of the proposed Final Judgment, and the Court has not otherwise ordered continued compliance with the terms and provisions of the proposed Final Judgment, then the parties are released from all further obligations under this Stipulation, and the making of this Stipulation shall be without prejudice to any party in this or any other proceeding.

      F.      Defendants represent that the divestitures ordered in the proposed Final Judgment can and will be made, and that they will later raise no claim of mistake, hardship or difficulty of compliance as grounds for asking the Court to modify any of the provisions contained therein.

## V. Asset Preservation

Until the divestitures required by the Final Judgment have been accomplished:

      A.      Defendants shall preserve, maintain, and continue to operate the Divestiture Assets as ongoing, economically viable competitive assets and shall operate each Divestiture Asset as a viable competitor in their respective fundamentals, estimates and aftermarket research markets. Defendants shall take all steps necessary to ensure that Thomson and Reuters independently set the prices and other terms and conditions for the sale of Fundamentals and

Estimates to Direct Content Datafeed customers and redistributors, while continuing to maintain current levels of service. Within twenty (20) days after the entry of this Stipulation, Defendants will inform the United States and the Monitoring Trustee of the steps Defendants have taken to comply with this Stipulation.

B.      Defendants shall use all reasonable efforts to develop, maintain, and increase the sales and revenues of the products and services produced, operated, developed, updated, delivered, marketed, distributed, licensed, or sold under the Divestiture Assets, and shall maintain at 2007 or previously approved levels for 2008, whichever are higher, all support and operational services relating to maintenance, updating, order processing, accounting, promotions, advertising, sales, customer service, technical assistance, marketing, and distribution for the Divestiture Assets.

D.      Defendants shall provide sufficient working capital and lines and sources of credit to maintain the Divestiture Assets as economically viable and competitive, ongoing concerns, consistent with the requirements of Sections V (A), (C) and (D) of this Stipulation.

E.      Defendants shall not, except as part of a divestiture approved by the United States in accordance with the terms of the proposed Final Judgment, remove, sell, license, assign, transfer, pledge or otherwise dispose of any of the Divestiture Assets.

F.      Defendants shall take no action that would jeopardize, delay, or impede the sale of the Divestiture Assets.

G.      Defendants shall not transfer or reassign the personnel identified on Schedule 2 of the proposed Final Judgment to other areas within the company except for transfer bids initiated by employees pursuant to Defendants' regular, established job posting policy. Defendants shall

-4-

provide the United States and the Monitoring Trustee with ten (10) calendar days notice of such transfer.

H.      Defendants shall take no action that would interfere with the ability of any trustee appointed by this Court to monitor compliance with the proposed Final Judgment or to complete the divestitures pursuant to the proposed Final Judgment to an Acquirer or Acquirers acceptable to the United States

I.       This Stipulation shall remain in effect until consummation of the divestitures required by the proposed Final Judgment or until further order of the Court.

Dated: February 19, 2008

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA:

_____
Robert P. Mahnke
U.S. Department of Justice
Antitrust Division, Networks and
Technology Enforcement Section
600 E Street, NW, Suite 9500
Washington, D.C.  20530

FOR DEFENDANT
THE THOMSON CORPORATION:

_____
W. Dale Collins (D.C. Bar #430266)
Shearman & Sterling LLP
801 Pennsylvania Avenue, NW, Suite 900
Washington, D.C.  20004

_____
Beau W. Buffier
Shearman & Sterling LLP
599 Lexington Avenue
New York, New York  10022

FOR DEFENDANT
REUTERS GROUP PLC:

_____
Lee K. Van Voorhis (D.C. Bar #457798)
Weil, Gotshal & Manges LLP
1300 I Street, NW
Washington, D.C.  20005

## ORDER

**IT IS SO ORDERED** by the Court, this _____ day of _____, _____ .

_____
United States District Judge